In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-3184

SHAWN EAGAN,

*Plaintiff-Appellant,*

*v.*

MICHAEL DEMPSEY, et al.,

*Defendants-Appellees.*

_____

Appeal from the United States District Court for the
Central District of Illinois.
No. 1:15-cv-01149 — **Colin S. Bruce**, *Judge.*

_____

ARGUED NOVEMBER 4, 2020 — DECIDED FEBRUARY 9, 2021

_____

Before EASTERBROOK, RIPPLE, and ROVNER, *Circuit Judges.*

RIPPLE, *Circuit Judge.* Shawn Eagan, an inmate in the Illinois Department of Corrections, brought this section 1983 action to seek redress for alleged violations of the Eighth Amendment by medical and custodial staff at Pontiac Correctional Center ("Pontiac").[1] Mr. Eagan brings this appeal,

_____

[1] Defendants James Berry, Dillon Law, and Travis Sullivan were correc-

(continued … )

claiming that the district court abused its discretion when it denied his motions to recruit and appoint counsel for him. He also submits, in the alternative, that the district court erred in granting summary judgment for the defendants.

After careful study of the record as well as the written and oral arguments of counsel, we hold that, in its consideration of the motion to recruit counsel, the district court departed significantly from our decision in *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007) (en banc). We also hold that Mr. Eagan has established that, but for this departure, there is a reasonable likelihood that the assistance of counsel would have altered the outcome of the defendants' summary judgment motion with respect to Mr. Eagan's claims based on Dr. Dempsey's decisions on December 1 and 2, 2014. Mr. Eagan has not established, however, that there is a reasonable likelihood of a different outcome with respect to the officer defendants. Indeed, the record clearly supports the district court's grant of summary judgment in their favor.

Accordingly, the judgment of the district court is affirmed in part and vacated in part. The case is remanded for further proceedings consistent with this opinion.

---

( … continued)

tional officers at Pontiac during the relevant time. Defendant Aimee Moorhouse was a correctional medical technician ("CMT") at Pontiac. Defendant Michael Dempsey, a physician licensed to practice medicine in Illinois, was employed by Wexford Health Sources, Inc. to provide psychiatric services and medication management to incarcerated individuals at Pontiac.

# I

## BACKGROUND

### A.

Mr. Eagan suffers from a variety of mental illnesses including depression, schizophrenia, and bipolar disorder. On November 30, 2014, Mr. Eagan engaged in self-harming behaviors while under suicide watch. Pontiac maintains crisis-watch cells that are constructed of concrete and have steel doors with a plexiglass window in the door. These cells also have a "chuckhole" through which inmates can put their hands to allow the officers to cuff their hands behind their backs. Officers check and monitor inmates in crisis-watch cells on a thirty-minute, fifteen-minute, ten-minute, or continuous basis, depending on the orders left by medical and correctional personnel with responsibility for making those decisions. Under standing orders relating to Mr. Eagan, the officers monitored him every ten minutes.

Because of his illnesses, Mr. Eagan often hears the voice of a woman named "Lucina." When Lucina screams, Mr. Eagan attempts to dull the pain or quiet the screams by self-inflicting wounds and banging his head. Specifically, when Mr. Eagan has a crisis period, he attempts to assuage the noise and pain of the screams by banging his forehead against the cell door in an effort to induce a headache or to otherwise inflict pain, which he finds more acceptable than Lucina's screams. When the screams take over, Mr. Eagan is sometimes unable to stop himself.[2] When the subsequent

---

[2] R.81, Ex. 1 at 6 (Eagan Dep. 22:2–9) ("Q: So you're in control in that situation still; is that right? A: Sometimes not. It's like some type of, like,

(continued … )

head-banging occurs, officers generally will grab Mr. Eagan through the bottom chuck, turn him around, and try to lead him out of the cell.

**1.**

On November 30, 2014, Mr. Eagan was in his crisis-watch cell when he heard Lucina scream. He had been banging his head for about two minutes when Officer Berry arrived, cuffed his hands, and took him to an area called the "holding tank." There, officers shackled Mr. Eagan to a bench, but Mr. Eagan started to bang his head backwards against the wall. Officers Sullivan and Law then had to restrain him inside of the holding tank. CMT Moorhouse entered the holding tank to tend to the bleeding cut on Mr. Eagan's forehead. Mr. Eagan continued to hear Lucina's screams.

After tending to Mr. Eagan's forehead wound, CMT Moorhouse stepped out of the holding tank and made a phone call to seek further direction. Upon her return, she instructed the officers that Dr. Dempsey had ordered that they place Mr. Eagan back in his cell on a ten-minute watch. Officers Sullivan, Law, and Berry therefore escorted Mr. Eagan back to his crisis-watch cell. Dr. Dempsey states that Mr. Eagan was warned that if he was unable to remain safe, he would receive forced injections to prevent him from continuously harming himself.

Within minutes, the screams restarted, and Mr. Eagan

( … continued)
push, like it's where, like, the screams will happen and I can take only so much. It's like something just take over me where I just, I don't know, be out of control and I can't really stop myself.").

again started banging his head against the plexiglass. Officer Sullivan ordered Mr. Eagan to cuff up, notified Lieutenant Zook, and applied wrist and ankle restraints. Lieutenant Zook and Officer Sullivan then escorted Mr. Eagan to the holding tank. After he was shackled to the bench, CMT Moorhouse again tended to Mr. Eagan's wound, which had become deeper.

After caring for Mr. Eagan's wound, CMT Moorhouse left and again called Dr. Dempsey. Dr. Dempsey ordered emergency enforced injections of 10 mg of Haldol and 50 mg of Benadryl. Dr. Dempsey explained in his affidavit that he prescribed Haldol because Haldol was similar to Risperdal, a drug Mr. Eagan had taken in the past with minimal side effects. Dr. Dempsey prescribed a low dosage of Haldol because temporary side effects of involuntary movement and tremors are known to occur. Dr. Dempsey's prescription of Benadryl, an anticholinergic drug, was to treat or prevent any Haldol side effects; Benadryl also has the added benefit of containing potent antihistaminic, anxiolytic, and sedative properties. After a nurse administered these medications by injection, officers escorted Mr. Eagan back to his original crisis-watch cell.

**2.**

In his deposition, Mr. Eagan stated that after the leg shackles and handcuffs were removed, he "[didn't] know what happened," but that he fell asleep on the floor until breakfast was distributed the next morning, December 1.[3] He recalled waking up on the floor. Mr. Eagan stated that his

---

[3] *Id.* at 15.

upper body felt locked, that he was stuck on his back, and that he was unable to get up to receive breakfast that morning. Mr. Eagan further stated that he experienced stiffness in his neck and that while his jaw had not yet been locked open, his ability to move his jaw was "off and on."[4] Mr. Eagan said he was able to crawl around, but after urinating in the corner of his cell, returned to lying on the floor until right before the 3:00 p.m. shift.

The crisis-watch observation logs, in which officers noted their observations of Mr. Eagan every ten minutes, recite that Mr. Eagan was on his bed when he was returned to his crisis-watch cell at 10:30 p.m. on November 30, 2014, and remained on his bed until December 1, 2014, at 6:50 a.m. The logs indicate that Mr. Eagan moved between his bed and the door from 7:00 a.m. until 1:10 p.m. and ate on his bed at 10:40 a.m. The crisis-watch logs indicate that Mr. Eagan was on the floor until 1:20 p.m. Mr. Eagan was observed back on his bed at 2:40 p.m.

Dr. Dempsey stated in his affidavit that he had evaluated Mr. Eagan at his cell around 9:35 a.m. on December 1, 2014. Dr. Dempsey stated that Mr. Eagan stood at his cell door and told him that, the night before, "the voices kept telling [him] to beat [his] head."[5] Mr. Eagan also reported that he had received the Haldol and Benadryl the night before, and that he had woken up hungry. Dr. Dempsey stated that Mr. Eagan did not complain of stiffness or an inability to move his body or jaw or of any headache. In addition, Dr. Dempsey ob-

---

[4] *Id.* at 21.

[5] R.84, Ex. 1 at 3–4.

served Mr. Eagan exhibit a full range of motion and ability to move his jaw normally when Mr. Eagan spoke with him.

According to Mr. Eagan, when the 3:00 p.m. shift began, his neighbor told the watch officer that something was wrong with Mr. Eagan. When the watch officer looked into Mr. Eagan's cell, the officer said that nothing was wrong with Mr. Eagan and that Mr. Eagan's situation was "funny."[6] Mr. Eagan recalled that Officer Sullivan was one of the officers on the 3:00 p.m. shift but did not remember the other officers. Mr. Eagan states that Officer Sullivan, among others, checked on him throughout the day, and that Officer Sullivan mocked Mr. Eagan and laughed at his condition. In his complaint, Mr. Eagan stated that when he asked for help, Officer Sullivan told Mr. Eagan, "You're faking."[7]

The crisis-watch logs indicate that Officer Leipold conducted the observations from 3:00 p.m. until 6:00 p.m. Officer Sullivan made observations from 6:10 p.m. until 6:50 p.m. Officers Leipold, Pyle, and Law performed the checks from 7:00 p.m. until the end of the shift at 11:00 p.m. From 11:00 p.m. until 5:50 a.m. the following morning, the officers on duty observed Mr. Eagan on the floor.

### 3.

Mr. Eagan recalled waking up on the floor on December 2, 2014, around breakfast time with his jaw locked wide-open. Mr. Eagan said the pain in his jaw was excruciating and that it hurt so much that he cried. Mr. Eagan also

---

[6] R.81, Ex. 1 at 16 (Eagan Dep. 62:20).

[7] R.1 at 7.

stated that his chest and neck were stiff and tight. According to the declaration of a neighboring inmate, Andrew McKissick, Mr. Eagan "started calling for help because his neck and face was locking up."[8] McKissick alerted officers for help. At approximately 9:00 a.m., Major Susan Prentiss approached Mr. Eagan's cell, and Mr. Eagan pointed to his jaw. Mr. Eagan recalled that Major Prentiss attempted to calm him down and said that she would get a medical technician to see him. Sometime later (but before 3:00 p.m.), CMT Jennifer Tinsley evaluated Mr. Eagan. Mr. Eagan continued to point to his jaw. Mr. Eagan stated that CMT Tinsley told him that she could not do anything for him, but that she would let Dr. Dempsey know of his situation immediately.

The crisis-watch logs for December 2, 2014, indicate that Mr. Eagan ate breakfast at 6:30 a.m. and was talking at 6:40 and 6:50 a.m. Mr. Eagan was observed on the floor, at the door, and on his bed for the rest of the morning, and was observed eating at 10:20 a.m. At 12:00 p.m., licensed clinical social worker Andrea Moss came to evaluate Mr. Eagan. Her report recites that, upon her arrival, Mr. Eagan was standing naked at the back of his cell, and that she therefore told him that she would not speak with him unless he put on his smock. Mr. Eagan responded, "I'm done messin[g] [with] you, I don't want to talk to you."[9] When Ms. Moss began to walk away, Mr. Eagan started yelling, "mental health is

---

[8] R.90, Ex. 1 at 4 (Decl. of Andrew McKissick).

[9] R.81, Ex. 2 at 14.

playing games and won't talk to me, I ain't do nothing."[10] Ms. Moss approached Mr. Eagan's cell once Mr. Eagan was dressed, but Mr. Eagan refused to speak with Ms. Moss, choosing to stare blankly at the wall. Ms. Moss ordered a follow-up for the following day.

At 2:00 p.m., Dr. Dempsey evaluated Mr. Eagan for side-effects from the forced injections given on November 30, 2014. Mr. Eagan complained of "neck stiffness," but exhibited a full range of motion, no tremors, and the ability to move his neck, mouth, and jaw normally.[11] Dr. Dempsey noted that Mr. Eagan had "no dystonia or other extrapyramidal side effects"[12] and made no complaints of headache. Mr. Eagan states that Dr. Dempsey told him that he would not give Mr. Eagan anything because Mr. Eagan was engaging in self-inflicted harm of banging his head. McKissick, Mr. Eagan's neighbor, stated that he overheard Dr. Dempsey tell Mr. Eagan that this is what he wanted him to feel like, that "he (Dr. Dempsey) wanted Eagan to feel the psych meds so he will think about the shot before he hit his head again."[13] McKissick, who had also received two shots of psychotropic drugs, claimed he suffered from the same side ef-

---

[10] *Id.*

[11] R.84, Ex. 1 at 4.

[12] *Id.* "Dystonia" means "[p]rolonged involuntary muscular contractions that may cause twisting (torsion) of body parts, repetitive movements, and increased muscular tone." *Taber's Medical Dictionary* (23d ed. 2017). "Extrapyramidal side effects of medication" may include muscular rigidity, tremors, and difficulty walking. *Id.*

[13] R.90, Ex. 1 at 6 (Aff. of Andrew McKissick).

fects from the "shot" and "was told that [Dr.] Dempsey wouldn't order [him] [or] inmate Eagan the shot for the side [e]ffects."[14]

The crisis-watch observation logs indicate that Mr. Eagan responded for the count at 3:00 p.m. Officer Leipold was the watch officer during the 3:00 to 11:00 p.m. shift. When Officer Leipold came around, Mr. Eagan attempted to point out his jaw problem. Mr. Eagan's neighbor also told Officer Leipold that Mr. Eagan's jaw was locked up, but Officer Leipold stated that he could not do anything about it. Mr. Eagan acknowledged, however, that Officer Leipold did attempt to keep him calm. Each time Officer Leipold came to check on him, Officer Leipold tried to talk to him and attempted to make sure he would not start banging his head. As Mr. Eagan put it, Officer Leipold "was actually trying to help me" even without giving him medication.[15] Officer Leipold nevertheless observed Mr. Eagan banging on the door and on his bed over the next four watches, and at 3:50 p.m., observed Mr. Eagan banging his head on the door. Officer Leipold then took Mr. Eagan to the holding tank at 4:00 p.m.

A medical technician came to evaluate Mr. Eagan and attempted to calm him down. When the CMT went to make a phone call, Officer Sullivan came into the holding tank to restrain Mr. Eagan. When the CMT returned, she continued to tell Mr. Eagan to relax and stated that Dr. Dempsey was not going to do anything for him, and that they had to put

---

[14] *Id.* at 5 (Decl. of Andrew McKissick).

[15] R.81, Ex. 1 at 20 (Eagan Dep. 77:18–22).

Mr. Eagan back in his cell. Officer Sullivan escorted Mr. Eagan back to his cell.

Mr. Eagan recalled that, later during the evening, he saw and heard Officer Sullivan laughing and mocking him. Mr. Eagan stated that when dinner trays were passed out, Officer Sullivan had said, "Well, you ain't going to be eating no pizza today."[16]

Around 11:30 p.m. that evening, Mr. Eagan's jaw snapped shut and his mouth closed. Mr. Eagan asked the watch officer on the overnight shift for some Tylenol but was unable to acquire any. Mr. Eagan experienced jaw soreness but was able to eat breakfast the following morning on December 3, 2014. Mr. Eagan stated at his deposition that he continued to experience residual jaw soreness and popping.

## B.

On April 15, 2015, Mr. Eagan filed his pro se complaint in the district court; he named as defendants Dr. Dempsey, CMT Moorhouse, Officers Berry, Law, and Sullivan, and Warden Pfeister. On June 18, 2015, a merit review hearing was held before the district court. The court dismissed Mr. Eagan's claim against Warden Pfeister, but determined that Mr. Eagan sufficiently alleged that (1) Officers Berry, Sullivan, Law, and Moorhouse failed to protect Mr. Eagan from a substantial risk of harm; (2) Officer Sullivan was deliberately indifferent to Mr. Eagan's serious medical condition, excruciating head pain; and (3) Dr. Dempsey was deliberately indifferent to Mr. Eagan's serious medical condi-

---

[16] *Id.* at 19.

tion when he failed to provide treatment for his locked jaw and for his mental health condition.

In July 2015, Mr. Eagan filed two motions for appointment of counsel. In his first motion, Mr. Eagan stated that the issues in his case were complex and that the case likely would involve conflicting testimony. He also noted that he had an eighth-grade education and a mental illness handicap. Mr. Eagan informed the court that he had made repeated efforts to obtain counsel, but that only one law firm had responded, denying his request. Mr. Eagan also attached the letter declining assistance that he had received from the Chicago Lawyers' Committee and further listed five other firms that he had contacted. Finally, Mr. Eagan attached his Mental Health Treatment Plan, which described his treatment plan as avoiding future crisis watches resulting from "self-harming behaviors" and "commanding voices."[17]

On September 15, 2015, Mr. Eagan filed a motion requesting a status update on his two motions requesting recruitment and appointment of counsel. On September 29, 2015, the district court entered a text order denying Mr. Eagan's motions for appointment of counsel, stating that Mr. Eagan had not provided "any evidence that he has attempted to find counsel on his own such as a list of attorneys contacted or copies of letters sent or received."[18] In addition, the district court issued a Prisoner Scheduling Order on September 29, 2015, that detailed discovery deadlines and court procedures. On October 1, 2015, Mr. Eagan filed a motion request-

---

[17] R.15 at 5.

[18] September 29, 2015 Text Order.

ing the court reconsider its September 29, 2015 text order and appoint counsel. Mr. Eagan reiterated that he was mentally ill and that he *had* attempted to contact attorneys. Mr. Eagan attached a letter declining representation from one law firm and reattached his Mental Health Treatment Plan.

On October 13, 2015, Mr. Eagan requested the court to order Pontiac to preserve video footage from November 30 to December 2, 2014, and to release his injury incident reports and medical and mental health records. Shortly after, Officers Berry, Law, Moorhouse, and Sullivan filed a motion for summary judgment for failure to exhaust administrative remedies, as well as a motion to stay discovery on the merits pending the court's consideration of the dispositive motion. The court issued a Rule 56 notice to Mr. Eagan and attached the text of Federal Rule of Civil Procedure 56. Mr. Eagan timely filed a memorandum in opposition to the summary judgment motion. The defendant officers filed their reply, to which Mr. Eagan filed two more replies. Mr. Eagan also filed a letter to the court detailing problems with the mail, his concerns that someone was intercepting his mail, and his inability to litigate his case.

On April 15, 2016, Mr. Eagan requested a status update on the summary judgment motion; the court denied the request by text order on April 18, 2016. On May 25, 2016, Mr. Eagan submitted another request for recruitment of counsel, again emphasizing the likelihood of conflicting testimony that would require attorney assistance, and reiterating that he was mentally ill and was prescribed mind-altering psychotropic medications. He further noted that he had no legal training or education and therefore had

to rely on jailhouse lawyers. Additionally, Mr. Eagan stated that his jailhouse lawyer was no longer at Pontiac and able to assist him. Mr. Eagan attached letters declining representation from additional law firms.

In July 2016, Mr. Eagan was transferred from Pontiac Correctional Center to Dixon Correctional Center. On August 25, 2016, Mr. Eagan informed the court of his change of address and filed another motion for a status update of the summary judgment motion and to request appointment of counsel. In his motion, Mr. Eagan explained that Dixon Correctional Center did not have access to the court's electronic filing system or legal envelopes and that he was not consistently allowed to go to the law library. The court issued a text order on September 9, 2016, stating that it did not have the "authority to interfere in matters of prison administration" but that Mr. Eagan would "have the same opportunity to litigate his claims without electronic filing and … may request extensions of time if necessary."[19]

On September 16, 2016, the district court denied Mr. Eagan's requests for counsel and denied the defendant officers' motion for summary judgment. Addressing Mr. Eagan's requests for counsel, the court recognized that Mr. Eagan had now provided evidence of his efforts to obtain counsel and focused on assessing Mr. Eagan's ability to litigate his claims. The court acknowledged Mr. Eagan's mental health issues but found Mr. Eagan's pleadings to date to be clear and on point and that Mr. Eagan had been responsive and able to identify the relevant issues. The court determined

---

[19] September 9, 2016 Text Order.

that Mr. Eagan would be able to obtain medical records through simple discovery requests and be able to testify to his personal experiences and observations.

In October 2016, Mr. Eagan filed two more motions for appointment of counsel. Mr. Eagan asked the court to cancel his scheduled deposition until he had retained counsel, expressing concern that he might say something that could be used against him in a criminal prosecution. On October 11, 2016, the district court entered a text order rejecting both motions for appointment of counsel. The court noted that Mr. Eagan did not identify any pending criminal cases and that "his claims are not obviously related to any potential criminal case."[20] The court encouraged Mr. Eagan to consult with his attorney if he did have a pending criminal case. The court also found that Mr. Eagan failed to provide any factual support for his claims that he suffered from mental illness and that he was unable to represent himself.

On October 21, 2016, Mr. Eagan then filed motions to compel CMT Moorhouse and Dr. Dempsey to respond to interrogatories and produce documents. On October 24, 2016, Mr. Eagan also filed a motion to compel discovery and preserve evidence. On November 4, 2016, Mr. Eagan filed another motion to request counsel.

In its November 7, 2016 text order, the court denied all three of Mr. Eagan's discovery motions. The court also granted the defendants' requests for additional time to conduct discovery and denied Mr. Eagan's motion to compel video footage because the defendants "denied that any video

---

[20] October 11, 2016 Text Order.

evidence exists, and Plaintiff has offered nothing to show that Defendants['] representation is untrue."[21] The court once again denied Mr. Eagan's motion to request counsel, determining that Mr. Eagan was sufficiently competent to litigate his own claims. The court stated:

> In the instant case, Plaintiff has filed cogent pleadings with the Court; his case has survived a merit review; and his case has survived a motion for summary judgment. Furthermore, Plaintiff['s] claim is not so novel or complex that he cannot litigate it himself. Plaintiff has personal knowledge of the facts supporting his claim and appears capable of cross-examining Defendants regarding their version of the events. Plaintiff has offered no reason why he cannot litigate this case or why his case differs from any other of the plethora of prisoner pro se plaintiffs who ask for the appointment of counsel in almost every case filed. Plaintiff appears competent to litigate this case himself, and therefore, the Court denies his motions to appoint counsel.[22]

On November 28, 2016, Mr. Eagan requested that the court reconsider its November 7, 2016 text order and included forty-three pages of medical records as part of his motion.

---

[21] November 7, 2016 Text Order (denying Mr. Eagan's motions to compel evidence).

[22] November 7, 2016 Text Order (denying Mr. Eagan's motion to request counsel) (citations omitted).

The court denied Mr. Eagan's request on December 7, 2016, in a text order, stating that "[a]lthough Plaintiff asserts that he suffers from a mental disorder that makes it difficult for him to litigate this case, the documents attached to his motion to reconsider reveal that Plaintiff is able to read and write."[23]

Discovery continued in December 2016. Attorneys for Dr. Dempsey and the defendant officers took Mr. Eagan's deposition. The defendant officers responded to Mr. Eagan's request for production and to his requests for admissions. Dr. Dempsey submitted responses to Mr. Eagan's requests for production, for interrogatories, and for admissions.[24]

Mr. Eagan filed multiple motions to compel CMT Moorhouse to respond to his multiple requests for interrogatories and production of documents. In response to Mr. Eagan's first motion to compel discovery from defendant Moorhouse, defense counsel stated that due to "inadvertent error" and "the length of time that passed while discovery was stayed, the undersigned forgot that Plaintiff previously sent discovery for Defendant Moorhouse."[25] The court granted Dr. Dempsey and CMT Moorhouse's requests for extensions of time, moving their deadlines to December 19, 2016. In response to Mr. Eagan's second motion to compel, defense counsel stated he was informed on November 17, 2016, that CMT Moorhouse no longer worked for the Illinois Depart-

---

[23] December 7, 2016 Text Order.

[24] *See* R.57; R.70; R.71; R.73.

[25] R.58 at 2.

ment of Corrections and had received an updated mailing address on December 26, 2016. On January 12, 2017, the court denied Mr. Eagan's second motion to compel and granted the defendants an additional two weeks to respond.

On February 13, 2017, Mr. Eagan filed a second motion for reconsideration of the court's November 7, 2016 text order. Specifically, Mr. Eagan reiterated his dependence on jailhouse lawyers to litigate his case and his inability to litigate his claims, given his eighth-grade education and lack of legal experience. Additionally, Mr. Eagan raised the challenges of being "locked-up in a prison in which the incident did not take place."[26] Mr. Eagan stated he was unable to investigate the facts or to interview inmates and correctional officials with knowledge of the incident because they were housed and employed in a separate facility.

The court denied Mr. Eagan's request the following day "for the reasons previously given by the Court."[27] The court briefly responded to Mr. Eagan's jailhouse lawyer argument, stating that the mere fact of jailhouse lawyer assistance does not prove a plaintiff is incapable of presenting his own case. Because the court did not find Mr. Eagan's claims to be novel or overly complex, the court concluded that he was capable of litigating his claims.

Officers Berry, Law, Sullivan, and Moorhouse filed a motion for summary judgment on March 3, 2017. Dr. Dempsey then filed his motion for summary judgment on March 10,

---

[26] R.77 at 4.

[27] February 14, 2017 Text Order.

2017. These motions addressed the merits of the litigation. Mr. Eagan submitted another motion to request counsel on March 6, 2017. Mr. Eagan filed his responses in opposition. In response to Officers Berry, Law, Sullivan, and Moorhouse, Mr. Eagan attached his own affidavit, the affidavits of an inmate in a neighboring cell, and CMT Moorhouse's inter- rogatory responses. In their reply, the officers contended that the only fact that Mr. Eagan disputed was the identity of the nurse who treated him on December 2, 2014, when Of- ficer Sullivan was on duty, a fact that was immaterial. With regard to Mr. Eagan's factual contentions on summary judgment, the officers moved to strike statements incon- sistent with Mr. Eagan's deposition testimony. In reply, Dr. Dempsey similarly pointed to Mr. Eagan's inconsistent factual statements and contended that Mr. Eagan failed to submit any admissible evidence supporting his assertions. Mr. Eagan filed sur-replies, a supplemental response, and a motion for sanctions against the Defendants.

The district court granted the defendants' motions for summary judgment. The court held that Mr. Eagan had failed to identify any admissible evidence showing that any defendant displayed deliberate indifference toward his seri- ous mental health or medical needs or that any defendant failed to protect him. The court held that Officers Berry, Law, Moorhouse, and Sullivan were entitled to summary judgment because (1) they were not aware of any specific threat to Mr. Eagan's safety when they returned him to his crisis-watch cell the first time on November 30, 2014, and (2) they were entitled to rely on Dr. Dempsey's medical instruc- tions to return Mr. Eagan to his crisis-watch cell. The court held that Officer Sullivan was entitled to summary judgment because Mr. Eagan offered no evidence that Officer Sullivan

was personally involved in depriving him of any needed medical attention. Finally, the court held that Dr. Dempsey was entitled to summary judgment because (1) Mr. Eagan had failed to demonstrate that he suffered from a serious medical condition and (2) Dr. Dempsey's treatment was appropriate.

Mr. Eagan timely filed his notice of appeal.

## II

## DISCUSSION

### A.

Mr. Eagan asks that we review the district court's denial of his motions for the recruitment and appointment of counsel. We review a district court's denial of a request for appointed counsel for abuse of discretion. *Pruitt*, 503 F.3d at 658. Our inquiry "is not whether we would have recruited a volunteer lawyer in the circumstances, but whether the district court applied the correct legal standard and reached a reasonable decision based on facts supported by the record." *Id.* Moreover, our "review is necessarily limited to the evidence available *when the § 1915(e)(1) motion was denied.*" *Id.* at 659 (emphasis in original). A court abuses its discretion when "(1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary." *Id.* at 658 (citing *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004) (quotations omitted)).

**1.**

We begin by stating the governing principles established by statute and case law. In *Pruitt*, we addressed comprehensively the principles that ought to guide a district court in evaluating a motion to recruit counsel. In federal civil litigation, a litigant has "no right to recruitment of counsel." *Dewitt v. Corizon, Inc.*, 760 F.3d 654, 657 (7th Cir. 2014). However, under the federal *in forma pauperis* statute, "[t]he court may request an attorney to represent any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). In *Pruitt*, we further stated the basic analytical approach that must guide our inquiry when reviewing the decision of a district court:

> When confronted with a request under § 1915(e)(1) for pro bono counsel, the district court is to make the following inquiries: (1) has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?

*Pruitt*, 503 F.3d at 654–55 (citing *Farmer v. Haas*, 990 F.2d 319, 321–22 (7th Cir. 1993)).

The first inquiry "requires the indigent litigant to reasonably attempt to get a lawyer." *Thomas v. Wardell*, 951 F.3d 854, 859 (7th Cir. 2020). This is a mandatory, threshold inquiry that must be determined before moving to the second inquiry. *See Davis v. Moroney*, 857 F.3d 748, 753 (7th Cir. 2017) (Kanne, J., concurring) (noting the district court erred "by not crediting [the plaintiff] for following existing precedent in attempting to obtain a lawyer to represent him");

*Jackson v. Cnty. of McLean*, 953 F.2d 1070, 1073 (7th Cir. 1992) ("[W]e believe that § 1915(d) requires a threshold inquiry into the indigent's efforts to secure counsel.").

The second inquiry requires consideration of both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims himself. *Pruitt*, 503 F.3d at 655. These two considerations "are necessarily intertwined; the difficulty of the case is considered against the plaintiff's litigation capabilities, and those capabilities are examined in light of the challenges specific to the case at hand." *Id.* Specifically, courts should consider "whether the difficulty of the case—factually and legally— exceeds the particular plaintiff's capacity as a layperson to coherently present it to the judge or jury himself." *Id.* This assessment of the plaintiff's apparent competence extends beyond the trial stage of proceedings; it must include "the tasks that normally attend litigation: evidence gathering, preparing and responding to motions and other court filings, and trial." *Id.*

Although there are no fixed criteria for determining whether a plaintiff is competent to litigate his own case, a district court certainly should consider the plaintiff's literacy, communication skills, educational level, litigation experience, intellectual capacity, and psychological history. *Id.* The court must examine specifically the plaintiff's ability to litigate the case, as opposed to the ability of any "jailhouse lawyer" assisting the plaintiff. *See Dewitt*, 760 F.3d at 658; *McCaa v. Hamilton*, 893 F.3d 1027, 1033 (7th Cir. 2018). These are practical inquiries, and the court should consider any available relevant evidence. *Pruitt*, 503 F.3d at 655.

Similarly, there are no fixed criteria for evaluating the factual and legal difficulty of the plaintiff's claims. *Id.* Indeed, we have resisted laying down categorial rules or presumptions for or against recruitment of counsel; rather, "[t]he inquiry into plaintiff competence and case difficulty is particularized to the person and case before the court." *Id.* at 656.

In an effort to assist our district court colleagues in this difficult task, our earlier cases have earmarked particular circumstances that warrant the court's careful consideration in the course of its evaluation. We have stressed, for instance, that "complexity increases and competence decreases as a case proceeds to the advanced phases of litigation." *James v. Eli*, 889 F.3d 320, 327 (7th Cir. 2018). "[A]s the case moves beyond the pleading stage, into discovery, and closer to trial, the plaintiff will face an increasingly complex set of demands." *Pruitt*, 503 F.3d at 663 (Rovner, J., concurring); *Walker v. Price*, 900 F.3d 933, 938 (7th Cir. 2018) ("We have emphasized that the assistance of counsel becomes increasingly important as litigation enters its later stages."). "Taking depositions, conducting witness examinations, applying the rules of evidence, and making opening statements are beyond the ability of most pro se litigants to successfully carry out." *Miller v. Campanella*, 794 F.3d 878, 880 (7th Cir. 2015) (quoting *Perez v. Fenoglio*, 792 F.3d 768, 785 (7th Cir. 2015)). As such, "fail[ing] to consider the complexities of advanced-stage litigation activities and whether a litigant is capable of handling them" is an abuse of discretion. *Perez*, 792 F.3d at 785.

We also have noted the increased complexity in constitutional claims involving the state of mind of the defendant,

such as deliberate indifference. *See James*, 889 F.3d at 327–28; *Henderson v. Ghosh*, 755 F.3d 559, 566 (7th Cir. 2014); *Merritt v. Faulkner*, 697 F.2d 761, 764 (7th Cir. 1983). Cases involving complex medical issues also pose special issues. *Miller*, 794 F.3d at 880; *Santiago v. Walls*, 599 F.3d 749, 761 (7th Cir. 2010). "This is particularly true where a prisoner has received at least *some* medical treatment because he must show 'a substantial departure from accepted professional judgment, practice, or standards,' and expert medical evidence is often required to prove this aspect of his claim." *James*, 889 F.3d at 328 (quoting *Henderson*, 755 F.3d at 566) (emphasis in original).

Finally, we have emphasized "that a prisoner who is transferred to a facility where the events underlying his claims did not take place faces additional hurdles." *Pennewell v. Parish*, 923 F.3d 486, 491 (7th Cir. 2019). "When that happens it must be addressed by the district court because the plaintiff may not have access to witnesses, documents, or defendants necessary to make his case." *Id.* (citing *James*, 889 F.3d at 327).[28]

---

[28] *See also McCaa v. Hamilton*, 893 F.3d 1027, 1033 (7th Cir. 2018) ("The district court did not mention McCaa's transfer in denying his third motion, let alone did it address whether the transfer impacted McCaa's ability to litigate and engage in effective discovery. It should have."); *Navejar v. Iyiola*, 718 F.3d 692, 698 (7th Cir. 2013) ("[O]nce Navejar was transferred, he faced 'significant problems' in litigating pro se because, once at another institution, he was not readily able to 'identify key witnesses, depose the defendants and gather pertinent evidence[.]'"); *Santiago v. Walls*, 599 F.3d 749, 762 (7th Cir. 2010) ("Because he had been transferred to another facility after the events underlying his claims, he faced significant problems that he would not have faced if he had remained in the

(continued … )

**2.**

With the *Pruitt* framework in mind, we now evaluate each denial of Mr. Eagan's requests for appointed counsel.

Mr. Eagan made his first two requests for counsel in July 2015. Despite Mr. Eagan's informing the court of his repeated efforts to obtain counsel and his attaching the list of the firms he had contacted, the district court denied Mr. Eagan's first two requests for counsel on the ground that he had failed to provide any evidence of his efforts to find counsel on his own. This factual premise of the court's ruling was contrary to the record and therefore clearly erroneous. Because the district court ignored the substance of Mr. Eagan's submissions, its September 2015 denial constituted an abuse of discretion. *See Davis*, 857 F.3d at 753 (Kanne, J., concurring) (noting the district court's error in failing to credit plaintiff's attempt to obtain a lawyer).

In October 2015, Mr. Eagan requested the court reconsider its previous denial and filed another motion to request counsel. In May 2016, Mr. Eagan submitted another request for counsel, emphasizing his mental health problems and his prescribed mind-altering psychotropic medications. Mr. Eagan reiterated that because he lacked legal training, he had relied on the assistance of a jailhouse lawyer, but that his jailhouse lawyer had relocated and was no longer able to as-

---

( … continued)

same facility."); *Tucker v. Randall*, 948 F.2d 388, 391 (7th Cir. 1991) ("[P]laintiff is unable to investigate crucial facts because he currently is incarcerated in a facility different from that in which the alleged conduct took place.").

sist him. On August 25, 2016, Mr. Eagan filed a motion for a status update and notified the court that he had been transferred from Pontiac Correctional Center to Dixon Correctional Center. Mr. Eagan also complained of the resources available at Dixon and of his inability to go to the law library on a consistent basis. On September 9, 2016, the court, in a text order, acknowledged Mr. Eagan's new address and his difficulties with Dixon's resources. The court stated only that "[t]he Court does not have the authority to interfere in matters of prison administration," and that Mr. Eagan could litigate his claims without electronic filing, requesting extensions of time when necessary.[29]

On September 16, 2016, the court, in denying the officer defendants' first motion for summary judgment on exhaustion of remedies, also denied Mr. Eagan's October 2015 and May 2016 requests for counsel. The court briefly acknowledged Mr. Eagan's lack of a high school education and his mental health issues, but noted that his *pleadings* to date had been clear and on point, that Mr. Eagan had been able to identify the relevant issues and case law, and had submitted a brief better than most pro se litigants. Moreover, the district court noted that, in order to litigate his case, simple discovery requests and Mr. Eagan's own testimony would be sufficient. Consequently, appointment of counsel was not warranted.

In its ruling, however, the district court failed to evaluate the impact of two key factors bearing on Mr. Eagan's ability to represent himself as the litigation progressed to more

---

[29] September 9, 2016 Text Order.

complex stages: first, Mr. Eagan's reliance on the assistance of a jailhouse lawyer who had relocated; second, Mr. Eagan's transfer had moved him to a completely different facility. The district court's failure to reevaluate Mr. Eagan's capabilities under these changed circumstances was a clear deviation from *Pruitt*'s template. *See Navejar v. Iyiola*, 718 F.3d 692, 696 (7th Cir. 2013) (holding the district court abused its discretion when it ignored the plaintiff's "limited education, mental illness, language difficulties, and lack of access to fellow prisoners or other resources for assistance after his transfer").

In later denying Mr. Eagan's four requests for counsel in October and November 2016, the district court again departed from *Pruitt*'s cornerstones. First, the district court emphasized that Mr. Eagan already had survived merit review and a motion for summary judgment and that his claim was not novel or complex.[30] Specifically, the court stated that Mr. Eagan had offered no reason why he could not litigate his own case or why his case was particularly deserving of counsel. Here, the court failed to evaluate appropriately the complexity of Mr. Eagan's claims as they proceeded through a case's life cycle. *See Perez*, 792 F.3d at 785 ("District courts abuse their discretion where they fail to consider the complexities of advanced-stage litigation activities and whether a litigant is capable of handling them."). True, Mr. Eagan had survived a motion for summary judgment, but the motion had been limited to the exhaustion of administrative remedies, an issue substantially different from, and far less

---

[30] *See* October 11, 2016 Text Order; November 7, 2016 Text Order; December 7, 2016 Text Order.

complex than, establishing deliberate indifference in a case involving a mentally ill inmate. Although Mr. Eagan had personal knowledge of the facts supporting his claims, we have recognized the difficulty in proving states of mind and in addressing complex medical issues. Further, because Mr. Eagan *had* received *some* medical treatment, he has the *additional* hurdle of proving "'a substantial departure from accepted professional judgment, practice, or standards,' and expert medical evidence is often required to prove this aspect of his claim." *James*, 889 F.3d at 328 (quoting *Henderson*, 755 F.3d at 566); *see also Greeno v. Daley*, 414 F.3d 645, 658 (7th Cir. 2005) (finding the plaintiff's case "legally more complicated than a typical failure-to-treat claim because it requires an assessment of the adequacy of the treatment … receive[d], a question that will likely require expert testimony").

Second, the court again failed to address Mr. Eagan's *personal ability* to litigate his case. Contrary to the court's view that Mr. Eagan "ha[d] offered no reason why he cannot litigate this case or why his case differ[ed],"[31] the court failed to evaluate Mr. Eagan's ability to litigate without his jailhouse lawyer and from a different facility, a facility with few resources and more restricted movement. Rather, the court continued to emphasize that Mr. Eagan's pleadings had been "cogent" and "responsive," but never recognized that those pleadings had been with the assistance of a jailhouse lawyer and had been crafted at the same facility in which the events occurred. Mr. Eagan had been transferred to a different facil-

---

[31] November 7, 2016 Text Order.

ity in July 2016, prior to the start of discovery and defendants' second motions for summary judgment.[32] Without any weighing of the increased difficulty of proving that the two sets of defendants were deliberately indifferent, the court simply concluded that Mr. Eagan had made, and could continue to make, what it characterized as simple discovery requests.

The district court's lack of consideration of Mr. Eagan's mental health also is concerning. In weighing the impact of Mr. Eagan's mental illnesses, the court stated in its October 11, 2016 text order that Mr. Eagan had failed to provide any factual support for his mental illness. When Mr. Eagan attached forty-five pages of mental health documentation,[33] the court dismissed Mr. Eagan's request for help by stating that "the documents attached to his motion to reconsider reveal that Plaintiff is able to read and write."[34]

Mr. Eagan made his final request for counsel in February 2017. He reiterated that jailhouse lawyers previously had assisted him, that he lacked litigation experience, and that his

---

[32] Mr. Eagan was transferred to Dixon Correctional Center on July 11, 2016, after briefing had concluded in Defendants' first summary judgment motion and while discovery was stayed pending the disposition of that summary judgment motion. The court issued its summary judgment order on September 16, 2016, at which point discovery resumed.

[33] *See* R.65, Ex. 4; R.65, Ex. 5; R.65, Ex. 6. Mr. Eagan's mental health records indicate, among many things, that he suffered from depression, suicidal tendencies, antisocial personality disorder, and schizoaffective disorder; he had been placed on ten-minute crisis watches; and he had been prescribed psychotropic medications.

[34] December 7, 2016 Text Order.

ability to investigate the facts and interview other inmates and correctional officers was hampered by his being housed at a different facility from where the events transpired.[35] In addition, Mr. Eagan expressed the difficulty of having to respond to two separate sets of lawyers and the need for expert assistance and expert testimony.[36] The court denied his request the following day "for the reasons previously given by the court."[37] For the first time, the court acknowledged Mr. Eagan's reliance on jailhouse lawyers. The court continued to insist, however, that Mr. Eagan was competent, even though the court's prior evaluations of Mr. Eagan's competence were rooted in the cogency and responsiveness of the prior pleadings, which were prepared with the assistance of jailhouse lawyers. Contrary to *Pruitt*'s instructions, the district court consistently failed to conduct a *particularized* assessment of Mr. Eagan's individual abilities to handle adequately the litigation tasks *ahead* of him.

Not only did the district court treat Mr. Eagan and his capabilities in a stereotypical and non-particularized way, it also assessed the litigation challenges ahead of him in the same fashion. The district court's summary rejection of Mr. Eagan's concerns on the ground that they were "common barriers in prison litigation" cannot be reconciled with *Pruitt*'s mandate for an individualized assessment of the litigant *and* the case.[38] The district court's repeated conclusion

---

[35] R.77 at 2–4.

[36] *Id.* at 5–6.

[37] February 14, 2017 Text Order.

[38] *Id.*

that Mr. Eagan's claims were not "overly complex" without further elaboration was the type of "boilerplate language that we disapproved of in *Pruitt* because it ignores the plaintiff's abilities." *Navejar*, 718 F.3d at 696 (citing *Pruitt*, 503 F.3d at 649, 660).

We cannot allow our multifactor analytical approach in *Pruitt* to deteriorate into a collection of conclusory buzzwords devoid of any reference to the actual experience of the particular defendant in a particular case. Here, by failing to analyze adequately the particular task ahead of Mr. Eagan, the district court reduced the *Pruitt* analysis to an ineffectual collection of words. Whether evaluated separately or as a whole, the district court's rulings on the recruitment and appointment of counsel deviated substantially from our holding in *Pruitt* and constituted an abuse of discretion.

### 3.

#### a.

"Even if a district court's denial of counsel amounts to an abuse of discretion, we will reverse only upon a showing of prejudice." *Pruitt*, 503 F.3d at 659 (citing *Farmer*, 990 F.2d at 322). We emphasized in *Pruitt* that, although a plaintiff need not demonstrate that he would have won his case to establish prejudice, he must establish that there is "a *reasonable likelihood* that the presence of counsel would have made a difference in the outcome of the litigation." *Id.* The prejudice "question is not whether the case was a sure winner but for the absence of counsel; this is impossible to know. Rather, the question is whether assistance of counsel could have strengthened the preparation and presentation of the case in

a manner reasonably likely to alter the outcome." *Id.* at 660. In addition, "[p]rejudice (unlike abuse of discretion) may be established by an after-the-fact review 'of a litigant's poor performance before or during trial.'" *Navejar*, 718 F.3d at 697 (quoting *Pruitt*, 503 F.3d at 659–60).

We have rejected claims of prejudice when it is clear that counsel could have done nothing to salvage the plaintiff's case. For example, in *Owens v. Evans*, 878 F.3d 559 (7th Cir. 2017), the court found no prejudice because the plaintiff's strongest claim "was time-barred—something no attorney could overcome." *Id.* at 566.

When there are missteps on the plaintiff's part, we have considered how the adverse party and the court responded and assessed the plaintiff's purported factual disputes. In *Navejar*, the district court made two substantive errors in its decision to grant summary judgment that the pro se plaintiff was unable to contest. 718 F.3d at 697–98. First, the district court accepted two legal arguments presented by the defendants that were erroneous and prejudicial. *Id.* Second, the plaintiff was prejudiced when he was transferred to a different prison, as "he faced 'significant problems' in litigating pro se because, once at another institution, he was not readily able to 'identify key witnesses, depose the defendants and gather pertinent evidence,' or proceed against John Doe defendants because he couldn't ascertain their identities." *Id.* at 698 (quoting *Santiago*, 599 F.3d at 766). And there, "the named defendants avoided producing virtually everything he requested in discovery." *Id.* Because "[c]ounsel would likely not have faced the same obstacles," we held the plaintiff suffered prejudice and "that there [was] a reasonable

likelihood that Navejar would have overcome summary judgment with the assistance of counsel." *Id.*

While we have been careful to "resist[] laying down categorial rules" in state-of-mind or deliberate indifference cases, *see Pruitt*, 503 F.3d at 656, a plaintiff's failure to put forth medical evidence, depose witnesses to testify to their subjective knowledge, or conduct discovery has been particularly relevant to our consideration of prejudice. In *James*, 889 F.3d at 320, we found that the plaintiff's deficient pretrial performance amounted to prejudice in part because the plaintiff "failed to depose any witnesses, including the named defendants, who could have been forced to testify 'about their subjective knowledge of [his] health and accepted standards of care.'" *Id.* at 331 (alteration in original) (quoting *Henderson*, 755 F.3d at 567). The plaintiff also failed to obtain any evidence establishing the accepted standard of care. Thus, we held that "a lawyer appointed in time to help plaintiff with discovery could have potentially helped him 'present sufficient facts to create a genuine issue about why [defendants] … advised a continuation of ineffective treatments that prolonged his pain.'" *Id.* (alteration in original) (quoting *Dewitt*, 760 F.3d at 659).

Similarly, in *Dewitt*, 760 F.3d 654, we recognized the complexities in deliberate indifference claims and determined that the plaintiff was prejudiced because counsel could have helped the plaintiff "present sufficient facts to create a genuine issue about why the doctor declined to follow a specialist's recommendations or advised a continuation of ineffective treatments that prolonged his pain[.]" *Id.* at 659. The plaintiff in *Dewitt* also raised discovery violations, which the court considered moot. Without "mak[ing]

any determinations on the merits of Dewitt's allegations relating to discovery abuses, [we found] that had Dewitt had counsel to navigate through discovery, there is a reasonable likelihood that he could have better advocated his position and changed the outcome of the litigation." *Id.* at 660.

The prejudice standard is also particularized to the phase of litigation. In *Pruitt*, the trial boiled down to a "swearing contest,"[39] and the plaintiff "fending for himself before and at trial severely compromised Pruitt's chances of persuading the jury." *Pruitt*, 503 F.3d at 660. There, the question of prejudice was "whether there [was] a reasonable likelihood that Pruitt lost the swearing contest not because of the inherent weakness of his claim, but because of his incompetent preparation and presentation of it to the jury." *Id.* at 661.

Here, the district court granted summary judgment in favor of the defendants because Mr. Eagan failed to offer any admissible evidence with which to create a genuine issue of material fact. Accordingly, the question of prejudice applicable here is whether there is a reasonable likelihood that Mr. Eagan failed to present any evidence not because of the inherent weakness of his claim, but because of his incompetent preparation and summary judgment briefing. *See id.* We now must examine the record and determine whether, with respect to each of the defendants, there is such a likelihood.

---

[39] We have found counsel to be particularly important when the plaintiff's case is a "swearing contest." *See Pruitt v. Mote*, 503 F.3d 647, 660 (7th Cir. 2007); *Walker v. Price*, 900 F.3d 933, 941 (7th Cir. 2018) (noting that plaintiff's "task was to highlight the strength of his own account and impeach the credibility of the defendants" and "the presence of counsel would have ensured a fair presentation of Walker's case to the jury").

**b.**

We begin with Mr. Eagan's case against Dr. Dempsey. In undertaking our review, we first remind ourselves that not "every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). "[A]n inadvertent failure to provide adequate medical care cannot be said to constitute 'an unnecessary and wanton infliction of pain' or to be 'repugnant to the conscience of mankind.'" *Id.* at 105–06. A physician's "negligen[ce] in diagnosing or treating a medical condition does not state a valid claim … under the Eighth Amendment." *Id.* at 106. Mr. Eagan therefore "must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs. It is only such indifference that can offend 'evolving standards of decency' in violation of the Eighth Amendment." *Id.* Thus, "without more, a mistake in professional judgment cannot be deliberate indifference." *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016).

**i.**

Mr. Eagan first submits that, on the night of November 30, Dr. Dempsey was deliberately indifferent when he returned Mr. Eagan to his cell without administering treatment. Mr. Eagan directs us to Dr. Dempsey's affidavit in which the physician "admits that Mr. Eagan 'poses a substantial risk of harm to himself *if left untreated* during his attempts to engage in self-harm.'"[40] Thus, Mr. Eagan argues, Dr. Dempsey "knew of, and disregarded, an excessive risk to

---

[40] Appellant's Br. 45 (quoting R.84, Ex. 1 at 2–3).

Mr. Eagan's safety."[41] Dr. Dempsey contends that Mr. Eagan has waived his deliberate indifference claim with respect to Dr. Dempsey's conduct on November 30.[42]

The district court rejected this claim in its summary judgment order. It stated that Mr. "Eagan's [c]omplaint did not state a deliberate indifference claim based upon the forced administration of Haldol" and that Mr. Eagan's "attempt[] to resurrect such a claim on summary judgment … [was] improper."[43] Urging affirmance of the district court's determination, Dr. Dempsey references Mr. Eagan's interrogatory answers in which he states that Dr. Dempsey was only deliberately indifferent on December 1 and 2.[44] In addition, Mr. Eagan stated in his deposition that he sued Dr. Dempsey because of Dr. Dempsey's lack of treatment to Mr. Eagan's locked jaw on December 1 and 2.

Dr. Dempsey correctly points out that, as a general principle, arguments presented for the first time on appeal are waived. *See Allen v. City of Chicago*, 865 F.3d 936, 943 (7th Cir. 2017). "However, a trial court is obligated to give a liberal construction to a pro se plaintiff's filings." *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) (citing *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)). Both of these considerations must be weighed by the district court in its final determination as to whether an argument has been

---

[41] *Id.*

[42] Dempsey-Appellee's Br. 17.

[43] R.98 at 11.

[44] Dempsey-Appellee's Br. 17; R.84, Ex. 7 at 2.

preserved. Here, we see no abuse of discretion by the district court. Although Mr. Eagan's complaint set forth Dr. Dempsey's involvement on November 30, and a liberal construction would make it possible to conclude that Mr. Eagan asserted a deliberate indifference claim, Mr. Eagan then stated in both his interrogatory answers and at his deposition that he was alleging only Dr. Dempsey was deliberately indifferent on December 1 and 2. We think that both the district court and Dr. Dempsey were entitled to take him at his word.

Even if the district court had overlooked Mr. Eagan's forfeiture, he would have failed to produce sufficient admissible evidence that Dr. Dempsey's decision to return Mr. Eagan to his cell. We agree with Dr. Dempsey that "[n]o reasonable jury could find Dr. Dempsey was deliberately indifferent by offering Eagan an opportunity to control his behavior before ordering the enforced administration of an antipsychotic medication."[45] Mr. Eagan certainly has not demonstrated that, with the assistance of counsel, there is a reasonable likelihood that he would have been able to make such a case. At bottom, this situation presents a straightforward judgment call by a physician as to when a patient's condition requires the administration of a drug. Conservative use of a powerful medication such as Haldol does not constitute deliberate indifference to a patient's needs. It is a matter of medical judgment, scrutinized, if at all, by the medical malpractice law of the state. *See Estelle*, 429 U.S. at 108 (holding that the proper forum for challenging a medical judgment

---

[45] Dempsey-Appellee's Br. 19.

was under state medical malpractice law); *Berry v. Peterman*, 604 F.3d 435, 441 (7th Cir. 2010) ("Neither medical malpractice nor mere disagreement with a doctor's medical judgment is enough to prove deliberate indifference in violation of the Eighth Amendment.").

### ii.

The district court also determined that Mr. Eagan had not shown that he could prove that Dr. Dempsey's treatment of Mr. Eagan on both December 1 and 2 was violative of the Eighth Amendment. When Dr. Dempsey evaluated Mr. Eagan on the morning of December 1, Mr. Eagan told him that he "woke up hungry," but "did not complain of any stiffness, inability to move his body or jaw or headache."[46] Mr. Eagan admits his jaw was not locked open until the morning of December 2. When Dr. Dempsey examined Mr. Eagan on December 2, however, he did not observe a locked jaw. Dr. Dempsey also stated that Mr. Eagan did not complain of such a condition. Mr. Eagan complained of "neck stiffness," but "exhibited a full range of motion, no tremors, and was able to move his neck, open his mouth and move his jaw normally."[47] Mr. Eagan counters that Dr. Dempsey must have been aware of his locked jaw on December 2 because multiple prison officials had contacted medical personnel.

Dr. Dempsey counters that Mr. "Eagan's alleged side-effects are inconsistent with the side effects associated

---

[46] R.84, Ex. 1 at 4.

[47] *Id.*

with Haldol."[48] In his affidavit, he explained that the side effect of muscle stiffness would be "obvious" and "would not migrate as Mr. Eagan allege[d]."[49] Dr. Dempsey's affidavit also stated that the only side effect reported from the Risperdal, a similar medication that Mr. Eagan had tolerated well, was "'some drowsiness,' making it unlikely that Haldol would cause him the side-effects alleged."[50] Dr. Dempsey submits that, far from acting in a deliberately indifferent manner, he had anticipated the possible side effects of the Haldol and prescribed the maximum dosage of Benadryl to offset any side effects. Moreover, Dr. Dempsey chose Haldol for its similarity to Risperdal, a drug Mr. Eagan had successfully taken in the past.

Mr. Eagan nevertheless contends that Dr. Dempsey was deliberately indifferent. According to Mr. Eagan, Dr. Dempsey withheld further treatment to teach Mr. Eagan a lesson and as a deserved consequence, not because withholding treatment was medically indicated. Mr. Eagan testified in his deposition that when Dr. Dempsey checked on him on December 2, he was unable to talk and was only able to point. In response, Mr. Eagan recalled that Dr. Dempsey stated: "You shouldn't be banging your head. I'm not going to get you nothing for that."[51] He also relies on the affidavit and declaration of McKissick, the inmate housed in the neighbor-

---

[48] Dempsey-Appellee's Br. 23.

[49] R.84, Ex. 1 at 5.

[50] *Id.*

[51] R.81, Ex. 1 at 9 (Eagan Dep. 33:10–11).

ing cell, who corroborates Mr. Eagan's recollection of Dr. Dempsey's statement. Mr. Eagan also notes Dr. Dempsey's "contemporaneous report suggesting that he thought Mr. Eagan was faking his injuries."[52] In this report, it appears that Dr. Dempsey's impression was that Mr. Eagan "appear[ed] to be exaggerating."[53]

Dr. Dempsey points to the crisis-watch logs as contemporaneous records that establish Mr. Eagan's "ab[ility] to speak, eat, move, and dress himself during the period of time he claims to have had a locked jaw and an inability to move."[54] He maintains that Mr. Eagan's statements, which "are so clearly contradicted by the contemporaneous records[,] … should be disregarded by this Court."[55] In support, Dr. Dempsey invites our attention to *Scott v. Harris*, 550 U.S. 372 (2007), for the proposition that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. There, the Court confronted a record containing a videotape that captured the events in question. The videotape, the authenticity of which went unchallenged, "clearly contradict[ed] the version of the story told by respondent." *Id.* at 378. The factual issue manufactured by the "[r]espondent's

---

[52] Appellant's Br. 41 (citing R.84, Ex. 3 at 9).

[53] R.84, Ex. 3 at 9.

[54] Dempsey-Appellee's Br. 21.

[55] *Id.*

version of events [was] so utterly discredited by the record that no reasonable jury could have believed him[, and] [t]he Court of Appeals should not have relied on such visible fiction." *Id.* at 380–81.

*Scott* is simply not apposite.[56] There is a significant qualitive difference between a videotape and crisis-watch logs

---

[56] We have described *Scott v. Harris*, 550 U.S. 372 (2007), as "a narrow, pragmatic exception" reserved for cases of "irrefutable evidence like that in *Scott*." *Gant v. Hartman*, 924 F.3d 445, 449–50, 451 (7th Cir. 2019). Courts, including ours, have declined to extend *Scott* treatment when video evidence is of poor quality or fails to capture the full event in question. *See, e.g.*, *McCottrell v. White*, 933 F.3d 651, 661 n.9 (7th Cir. 2019) (declining to draw independent factual conclusions from poor-quality, black and white video lacking audio); *Ramirez v. Martinez*, 716 F.3d 369, 374–75 (5th Cir. 2013) (videotape did not blatantly contradict plaintiff's version of facts, as it did not show every element of altercation); *Witt v. West Virginia State Police, Troop 2*, 633 F.3d 272, 277 (4th Cir. 2011) (finding poor-quality video that lacked sound and "fail[ed] to capture seven important seconds" of disputed event of little assistance); *cf. Williams v. Brooks*, 809 F.3d 936 (7th Cir. 2016) (relying on dashboard camera as video clearly depicted incident).

The Supreme Court, in *Scott*, kept open the possibility that evidence beyond videotapes could rise to the level of blatant contradiction. *See Coble v. City of White House, Tenn.*, 634 F.3d 865, 868–69 (6th Cir. 2011) ("There is nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes. The *Scott* opinion does not focus on the characteristics of a videotape, but on 'the record.'"). Courts, however, have been very reluctant to expand *Scott* to other non-video forms of evidence. Audio recordings, photographs, or forensic evidence often lack the real-time qualities and comprehensiveness that a video offers, presenting more contestable ambiguities. Thus, it is often far more difficult for non-video evidence to "blatantly contradict" a party's version of events in a way that a videotape could. *See Morton v. Kirkwood*, 707 F.3d 1276, 1284–85 (11th Cir. 2013) (finding forensic evidence—placement of

(continued … )

that were in the hands of officers. Neither the crisis-watch logs that are supposedly updated every ten minutes, nor the contemporaneous medical notes establish the same clarity of events as a videotape. While the crisis-watch logs are extensive and Dr. Dempsey has introduced the logs at summary judgment, there is very little evidence in the record on how much, if at all, Dr. Dempsey relied on the crisis-watch logs on the days in question in making his medical decisions. Moreover, the veracity of these handwritten logs, based on the observations of rotating officers, might be open to question in a way that a clear videotape, absent allegations that the video was doctored, would not be.

Nevertheless, we still are left with a very incomplete picture of Mr. Eagan's overall medical condition in terms of the severity of his pain, its duration, the prognosis for its abatement, and the availability and appropriateness of any remedy. Mr. Eagan, however, was not able to take any depositions of neighboring inmates who may have been able to speak to the pain he displayed, of the prison officials who examined him over the two days, or of Dr. Dempsey.

---

( … continued)

shattered glass, cartridge casings, tire tracks, and expert testimony—did not render the plaintiff's version of events "utterly incredible"); *Coble*, 634 F.3d at 868–70 (rejecting conclusion that silence in audio recording blatantly contradicted plaintiff's assertion that he was screaming); *United States v. Hughes*, 606 F.3d 311, 319–20 (6th Cir. 2010) (distinguishing photograph from videotape in *Scott*); *Blaylock v. City of Philadelphia*, 504 F.3d 405, 414 (3d Cir. 2007) (finding that photographs did not clearly support one version of facts and blatantly contradict the other in such a way that no reasonable jury could believe it).

Accepting the present state of the record and construing all reasonable inferences in favor of Mr. Eagan, Dr. Dempsey's position is that he performed a professional evaluation of the symptoms known to him and, on the basis of that examination and because of the known effects of the medications already administered, concluded that Mr. Eagan's complaints, in all probability, did not stem from the administration of Haldol. He observed that Mr. Eagan, while experiencing stiffness, was able to move his jaw normally. In any event, Mr. Eagan's pain resulting from his locked jaw was temporary—beginning and ending on December 2, when his jaw "snapped shut" between 11:30 p.m. and 12:30 a.m.[57] Dr. Dempsey's reluctance to encourage head-banging by administering readily additional painkillers was also a professional medical judgment for a psychiatrist to make.

A cause of action based on a physician's choice among courses of treatment cannot be sustained under the Eighth Amendment. *See McGowan v. Hulick*, 612 F.3d 636, 641 (7th Cir. 2010) ("[T]his dispute is over nothing but the choice of one routine medical procedure versus another, and that is not enough to state an Eighth Amendment Claim."); *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) ("There is not one 'proper' way to practice medicine in a prison, but rather a range of acceptable courses based on prevailing standards in the field."); *Abdul-Wadood v. Nathan*, 91 F.3d 1023, 1024 (7th Cir. 1996) ("[D]isagreement with the selection of medicine and therapy falls well short of demonstrating deliberate indifference to a serious medical need."). Whether that physi-

---

[57] R.81, Ex. 1 at 20 (Eagan Dep. 78:11–13).

cian made a permissible decision under contemporary medical standards is, at best, a matter for state-law adjudication under its medical malpractice jurisprudence.

Here, however, Mr. Eagan raises an additional dimension. He claims that Dr. Dempsey's decision to leave him in significant and prolonged pain in order to teach him a lesson about the consequences of self-destructive behavior does not involve a mere choice of medical remedies and is violative of the Eighth Amendment. On this question, we believe that the assistance of counsel would have been helpful to Mr. Eagan and that there is a reasonable likelihood that such assistance might have brought about a favorable result for him.

The key element missing from the summary judgment record is a deposition from Dr. Dempsey. The entire case against Dr. Dempsey turns on his intent in declining further medical intervention in the face of Mr. Eagan's claims that he was experiencing excruciating pain and the substantial risk of self-harm if left untreated. The practice of psychiatry is nuanced; it is *both* an art and a science.[58] There may well be a very straightforward professional explanation for Dr. Dempsey's decision to decline medical intervention when he did. Perhaps Dr. Dempsey is correct in concluding that Mr. Eagan was malingering. But Mr. Eagan should be allowed to explore adequately the professional reasonableness of that decision during the discovery process. Mr. Eagan claims that he continues to hear the voices and to experience the accompanying pain. With the assistance of an at-

---

[58] *See, e.g.*, *Suggs v. Lavallee*, 570 F.2d 1092, 1119 (2d Cir. 1978) (Kaufman, J., concurring) ("Yet, psychiatry is at best an inexact science[.]").

torney, and an expert if needed, Mr. Eagan would have been able to explore whether Dr. Dempsey's explanation is a professionally reasonable medical opinion.

On the record *as it stands today*, it is possible to conclude from the evidence that allowing Mr. Eagan to experience the consequences of his self-destructive behavior, at least for a while, was an acceptable course of proceeding. But to reach that conclusion, the record must be construed in a light most favorable to Dr. Dempsey, not Mr. Eagan. With an adequate opportunity to develop the record on the issue of Dr. Dempsey's intent, Mr. Eagan's case against him either will collapse or be ready for trial.

### c.

### i.

We now turn to Mr. Eagan's claims that Officers Berry, Law, Sullivan, and Moorhouse failed to protect him from self-harm on November 30, and that Officer Sullivan was deliberately indifferent to his serious medical needs on December 1 and 2. We examine whether there would be a reasonable likelihood of obtaining a different outcome in Mr. Eagan's case against the state officers if the motion to recruit counsel had been granted.

The principles governing our evaluation of this allegation are well-established. A prison official who acts with deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). This standard encompasses "both an objective and subjective element: (1) the harm that befell the prisoner must be objectively, sufficiently serious and a substantial risk to his or her health or safety, and (2) the indi-

vidual defendants were deliberately indifferent to the substantial risk to the prisoner's health and safety." *Collins v. Seeman*, 462 F.3d 757, 760 (7th Cir. 2006) (citing *Matos ex. rel. Matos v. O'Sullivan*, 335 F.3d 553, 556 (7th Cir. 2003)).

A failure to provide protection constitutes an Eighth Amendment violation only if deliberate indifference by prison officials to a prisoner's welfare effectively condones the harm by allowing it to happen. *Santiago*, 599 F.3d at 756. Suicide and acts of self-harm may constitute serious risks to an inmate's health and safety. *See, e.g.*, *Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 665 (7th Cir. 2012) ("[P]rison officials have an obligation to intervene when they know a prisoner suffers from self-destructive tendencies."); *Collins*, 462 F.3d at 760–61 (considering deliberate indifference in prison suicide context); *Hall v. Ryan*, 957 F.2d 402, 406 (7th Cir. 1992) (confirming "prisoner's right to be protected from self-destructive tendencies").

Mr. Eagan must demonstrate that the prison officials knew of and disregarded a serious risk to his health or safety. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837. Furthermore, "an official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment." *Id.* at 838.

A prison official, however, generally does not act with deliberate indifference "if she reasonably relied on the judgment of medical personnel." *Miranda v. Cnty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). Non-medical officials are presumptively "entitled to defer to the professional judgment of

the facility's medical officials on questions of prisoners' medical care." *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008); *see also King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (reiterating that non-medical officers "were 'entitled to defer to the judgment of jail health professionals so long as [they] did not ignore [the prisoner]'" (alterations in original) (quoting *Berry*, 604 F.3d at 440)); *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) ("Non-medical defendants … can rely on the expertise of medical personnel.").

A plaintiff may rebut this presumption by showing that the "jail officials had reason to know that their medical staff were failing to treat or inadequately treating an inmate." *Miranda*, 900 F.3d at 343 (citing *King*, 680 F.3d at 1018). In *Greeno v. Daley*, 414 F.3d 645 (7th Cir. 2005), we declined to extend liability to a non-medical official who handled the plaintiff prisoner's complaints, but we noted that "[p]erhaps it would be a different matter if [the official] had ignored Greeno's complaints entirely." *Id.* at 655–56; *see also Berry*, 604 F.3d at 440 (noting that the non-medical administrator was entitled to defer to the judgment of medical professionals so long as he did not ignore the prisoner). An official's "mere negligence in failing to detect and prevent subordinates' misconduct is not sufficient." *Arnett*, 658 F.3d at 755. A plaintiff must demonstrate that, through the manner and content of his communication, he "'gave the prison official sufficient notice to alert him or her to "an excessive risk to inmate health or safety."'" *Id.* (quoting *Vance v. Peters*, 97 F.3d 987, 993 (7th Cir. 1996)). Once alerted to such risk, an official's refusal to do more may amount to deliberate indifference. *See Vance*, 97 F.3d at 993 ("Once the official knows of that risk, the refusal or declination to exercise the authority of his or her office may reflect deliberate disregard."); *Hayes*,

546 F.3d at 527–28 (holding no deliberate indifference when non-medical defendants sought reports from medical officials to ensure no further action was required, and there was nothing in the reports that made it obvious the plaintiff may have been receiving inadequate care).

To state a cognizable claim because of inadequate medical care, "a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle*, 429 U.S. at 106. "A prisoner's claim for deliberate indifference must establish '(1) an objectively serious medical condition; and (2) an official's deliberate indifference to that condition.'" *Gomez v. Randle*, 680 F.3d 859, 865 (7th Cir. 2012) (quoting *Arnett*, 658 F.3d at 750).

"A 'serious' medical need is 'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (quoting *Laaman v. Helgemoe*, 437 F. Supp. 269, 311 (D.N.H. 1977)). A medical condition also may be serious if "'failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain."'" *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992)). A delay in treatment may rise to a constitutional violation "depend[ing] on the seriousness of the condition and the ease of providing treatment." *Smith v. Knox Cnty. Jail*, 666 F.3d 1037, 1040 (7th Cir. 2012) (quoting *McGowan*, 612 F.3d at 640).

An official is deliberately indifferent when the official is "'aware of facts from which the inference could be drawn that a substantial risk of harm exists,'" actually does draw the inference, and responds with "reckless disregard for the

known serious medical need, by inaction or woefully inadequate action." *Hudson v. McHugh*, 148 F.3d 859, 863 (7th Cir. 1998) (quoting *Farmer*, 511 U.S. at 838). Thus, we must "look into [the official's] subjective state of mind." *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016). Mr. Eagan does not need to "show that the official intended harm or believed that harm would occur," but must do more than "show[] mere negligence." *Id.*

## ii.

Mr. Eagan contends that Officers Berry, Law, Sullivan, and Moorhouse failed to protect him from self-harm. He first focuses on November 30, 2014, when they returned him to the crisis-watch cell without any medication to assuage his hallucinations and to prevent his self-destructive acts. For their part, the officers contend that "[n]othing in the record suggests that [they] were aware of but disregarded a substantial risk that Eagan would harm himself on November 30, 2014."[59] The officers emphasize that both times that he engaged in self-harm, Mr. Eagan promptly received medical care. The officers assert, moreover, that they were entitled to rely on Dr. Dempsey's medical expertise and that "they had no reason to doubt [Dr.] Dempsey's medical judgment that Eagan could be returned to his cell after first cutting his head, particularly because [Dr.] Dempsey ordered that prison staff continue to monitor Eagan every 10 minutes."[60]

---

[59] State-Appellee's Br. 21.

[60] *Id.* at 22.

The district court, in granting summary judgment in favor of the officers, reasoned that just because Mr. Eagan had self-injured before did not mean he would do so again. Mr. Eagan, the court continued, had not presented any evidence that the officers were aware of any specific threat to his safety. Mr. Eagan counters that the district court did not consider the "strong indications that he would continue to injure himself."[61] When the officers first took him to the holding tank for treatment to his forehead, Mr. Eagan had to be restrained physically from continuing to hit his head. In Mr. Eagan's view, the officers "were aware of a substantial risk that [he] would cause himself serious injury if returned to his cell without treating his mental health condition."[62]

In *King*, 680 F.3d 1013, we considered whether non-medical officers should have known that a nurse's care of a pretrial detainee was inadequate. Non-medical officers conducted a cell check and saw the detainee in his bed close his eyes and twitch his arm. *Id.* at 1016. Later that morning, upon finding the plaintiff "convulsing on the floor, screaming and foaming at the mouth[,] [t]hey called for a nurse." *Id.* When the nurse first examined the detainee, she was "convinced that [the detainee] was faking" and left him on the floor, despite his failure to respond to smelling salts and his face turning blue. *Id.* at 1017. No one called the on-call physician, and, an hour later, the detainee was found convulsing again. *Id.* The nurse was aware that the detainee may have been experiencing alprazolam withdrawal, which could

---

[61] Appellant's Br. 46.

[62] *Id.* at 45–46.

cause seizures, hallucination, and death; nevertheless, she did nothing except instruct the officers to move the detainee to a padded cell. *Id.* The detainee was pronounced dead later that evening. *Id.* Although we determined that there was a question of material fact regarding the nurse's actions, we affirmed the district court's grant of summary judgment in favor of the officers because the plaintiff provided no evidence that the officers "were aware that [the nurse] was improperly treating [the detainee]." *Id.* at 1018–19. Moreover, the officers "were not trained to assess whether an inmate [was] genuinely experiencing seizures, and so they lacked the capacity to judge whether [the nurse] made an appropriate diagnosis." *Id.* at 1018.

Accordingly, "[t]he question is whether the [officers] had any duty to do more than they did, in light of their knowledge of the situation." *Hayes*, 546 F.3d at 527. The record does not support an affirmative answer to that inquiry. As in *King*, Mr. Eagan has failed to establish that the officers necessarily *knew* that he would continue to engage in self-harm or that Dr. Dempsey was inadequately treating him. There is nothing in the record that shows the officers were trained to make a sound judgment as to whether Mr. Eagan would be able to control himself upon returning to his cell. They were entitled to rely on Dr. Dempsey's directions, as they did. Moreover, when Mr. Eagan returned to his previous pattern of self-destructive behavior, they once again sought Dr. Dempsey's further instructions. There simply is no evidence to permit a trier of fact to determine that they were deliberately indifferent to his well-being. Consequently, the district court's grant of summary judgment in favor of the officers for their November 30 conduct was proper.

### iii.

Mr. Eagan contends that Officer Sullivan was deliberately indifferent to his serious medical condition on December 1 and 2. Mr. Eagan first submits that the district court erred in concluding that he had failed to demonstrate an objectively serious medical condition; he believes that the court ignored evidence of his excruciating pain. In evaluating this contention, we start with a review of what the record reveals about what Mr. Eagan experienced each day after the administration of Haldol. Given the procedural posture of this case, we must review the record in the light most favorable to Mr. Eagan.

Mr. Eagan woke up on December 1 after the Haldol administration with upper body stiffness and his body feeling "locked."[63] He claims the Haldol "took over [his] body" and his ability to move, leaving him on the floor for most of the day.[64] It was not until December 2 that Mr. Eagan woke up with a locked jaw, causing him "excruciating pain" that he had never felt before, and resulting in his panicking.[65] Mr. Eagan continued to experience pain and discomfort in his arms and neck. Thus, our analysis must consider whether Mr. Eagan has demonstrated an objectively serious condition of muscle stiffness on December 1 or of lockjaw and upper body pain on December 2.

---

[63] R.81, Ex. 1 at 15 (Eagan Dep. 59:11).

[64] *Id.* at 7 (Eagan Dep. 26:23–27:5).

[65] *Id.* at 21 (Eagan Dep. 82:16).

In attempting to establish that his medical condition was serious on December 1, Mr. Eagan invites our attention to his deposition testimony where he testified to his personal experience and to his interaction with a neighboring inmate who had observed Mr. Eagan's condition. According to Mr. Eagan's deposition, that inmate had attempted to alert an officer that "[s]omething's wrong with Eagan. Something's wrong with him."[66] Mr. Eagan also recalled that when his neighbor notified an officer of Mr. Eagan's condition, the officer, whose identity Mr. Eagan could not recall, said, "Ain't nothing wrong with him," and found Mr. Eagan's condition "funny."[67] As to his lockjaw pain on December 2, Mr. Eagan points to his deposition testimony detailing the excruciating pain and that he complained of his condition to other prison officials, who "thought it sufficiently serious that they attempted to retrieve medical personnel, including Dr. Dempsey."[68] Nevertheless, although the district court failed to view the evidence in the light most favorable to Mr. Eagan, it is not at all certain that Mr. Eagan has established that his post-treatment state constituted a serious medical condition.

Even if we were to assume Mr. Eagan had serious medical conditions on both December 1 and 2, that is, of course,

---

[66] R.81, Ex. 1 at 16 (Eagan Dep. 62:15–16).

[67] *Id.* (Eagan Dep. 62:17–18, 62:20).

[68] Appellant's Br. 42; *see* R.81, Ex. 1 at 17–18 (Eagan Dep. 68:3–69:16) (Mr. Eagan notified Major Susan Prentiss, who stated she would get a medical technician); *id.* at 18 (Eagan Dep. 70:6–16) (CMT Jennifer Tinsley evaluated Mr. Eagan, who stated she would let Dr. Dempsey know immediately of Mr. Eagan's situation).

only the first step of the inquiry. Mr. Eagan still must demonstrate that he could establish, by a preponderance of the evidence at trial, that Officer Sullivan was subjectively aware of the serious condition and responded to the known condition with deliberate indifference.

The district court concluded that Mr. Eagan failed to provide any evidence that Officer Sullivan was involved personally in depriving him of any needed medical attention. The extent of Mr. Eagan's allegations of Officer Sullivan's subjective awareness on December 1 is based in Officer Sullivan's supposed taunting and mockery of Mr. Eagan's condition. Mr. Eagan testified in his deposition that multiple officers, including Officer Sullivan, "mocked" him and "laughed at" him because "of [his] condition," which, on December 1, was only muscle stiffness.[69] When his neighbor told one of the watch officers that "[s]omething's wrong with Eagan," a watch officer stated that Mr. Eagan's condition "was funny."[70] Mr. Eagan, however, could not identify which officer his neighbor notified.

Mr. Eagan recounts two interactions with Officer Sullivan on December 2, the day he experienced the locked jaw. On the afternoon of December 2, Mr. Eagan "again tried to get the attention of an officer to secure treatment for his locked open jaw."[71] When the officer stated he could not help Mr. Eagan's condition, Mr. Eagan began to bang his

---

[69] R.81, Ex. 1 at 16 (Eagan Dep. 63:22–23).

[70] *Id.* (Eagan Dep. 62:15–16, 62:20).

[71] *Id.* at 18 (Eagan Dep. 72:1–10).

head on the wall. Mr. Eagan was taken back to the holding tank where Officer Sullivan restrained him, just as he had on November 30. And when Officer Sullivan returned Mr. Eagan to his cell, he told Mr. Eagan, "Well, you ain't going to be eating no pizza today."[72] Later in the evening, between 7:00 and 9:00 p.m., Mr. Eagan remembered Officer Sullivan "laughing and mocking [him] and stuff."[73]

The crisis-watch logs and Mr. Eagan's deposition testimony indicate that Officer Leipold was the watch officer who performed the majority of the observation checks. Mr. Eagan praises Officer Leipold for checking in on him and for trying to calm him down when he was panicking over the lockjaw pain, even though he was unable to procure medication for Mr. Eagan. Mr. Eagan, however, does not allege Officer Leipold was deliberately indifferent. The only difference between Officer Leipold's conduct and Officer Sullivan's conduct was that Officer Leipold tried to talk to him and keep him calm, while Officer Sullivan made fun of Mr. Eagan. By the time Officer Sullivan interacted with Mr. Eagan on December 2, Mr. Eagan already had been examined by Major Prentiss and CMT Tinsley, who both determined there was nothing they could do, and by Dr. Dempsey, who decided not to prescribe anything further. Thus, it appears the response Mr. Eagan sought from Officer Sullivan was calming conversation. Mr. Eagan has not established that he sought any other help from Officer Sullivan, specifically, or that his condition was so severe that

---

[72] *Id.* at 19 (Eagan Dep. 75:6–7).

[73] *Id.* (Eagan Dep. 75:22).

Officer Sullivan should have sought further medical attention beyond what was already provided to him earlier in the day. While Officer Sullivan's words may have been inappropriate, the record will not support a conclusion that he acted with reckless disregard of Mr. Eagan's condition.

In the end, when the record is read in its totality, it is clear that the prison officers did not violate the Eighth Amendment. The record demonstrates that some officers questioned the legitimacy of Mr. Eagan's pain and that others did not provide as much comfort as Mr. Eagan would have liked. Still, the officers did ensure that medical personnel and a superior officer were called upon to provide care to Mr. Eagan and guidance to themselves. The record does not contain any evidence that would permit a reasonable juror to draw the inference that the officers were deliberately indifferent to Mr. Eagan's welfare. Nor does the record suggest, in practical terms, any concrete steps that an attorney might have taken to correct a deficiency in the record that might reasonably have led to a more favorable outcome. Accordingly, the district court did not abuse its discretion in denying the motion for recruitment of counsel with respect to the case against the officers. Moreover, there is no genuine issue of triable fact with respect to their liability under the Eighth Amendment. Insofar as it dismisses the case against the officers, the judgment of the district court must be affirmed.

## Conclusion

The district court abused its discretion in denying Mr. Eagan's motions for the recruitment of counsel. Because the denial of this motion may have affected the outcome of Mr. Eagan's claim against Dr. Dempsey, the judgment in fa-

vor of Dr. Dempsey is vacated and that case is remanded for further proceedings consistent with this opinion.

The district court did not abuse its discretion in denying the motions for counsel insofar as they pertain to Mr. Eagan's case against the officer defendants. Moreover, the motion for summary judgment in favor of the officer defendants was properly granted. Therefore, the judgment of the district court in favor of the officer defendants is affirmed.

No costs in this court.

AFFIRMED in part; VACATED and REMANDED in part

EASTERBROOK, *Circuit Judge*, dissenting in part. I admire the majority's thorough opinion, and I agree with its legal and factual exposition. But I do not agree with my colleagues on one matter of judgment: whether it is "reasonably likely" (*Pruitt v. Mote*, 503 F.3d 647, 660 (7th Cir. 2007) (en banc)) that counsel could have affected the outcome of Eagan's claim against Dr. Dempsey.

Dempsey's state of mind may be hard to fathom, as slip op. 44–45 says. But consider what is certain. Dempsey treated Eagan for his psychiatric problems and administered drugs that were medically appropriate. He then monitored his patient's reaction and deemed the outcome satisfactory. Eagan asserts that his jaw was painfully locked open as a result of the drugs, but Dempsey's files contain notes showing that no such effect occurred. Guards and members of the medical team observed Eagan every ten minutes throughout December 1 and December 2, 2014, and their contemporaneous notes report that he was speaking and eating, contradicting his current assertion that his jaw was locked open. It is possible, to be sure, that everyone other than Eagan himself is lying, but is that "reasonably likely"? The people who monitored Eagan's condition wrote their comments long before this suit was filed, at a time when they did not have a reason to make things up. So why would they falsify their observations? And, if they are all liars, how would an attorney show that they are?

My colleagues suggest (slip op. 45) that counsel might do this by taking Dempsey's deposition. Suppose that happens. Is Dempsey likely to do anything other than review his notes from 2014 and repeat them orally? How often do medical defendants admit during depositions that their treatment

notes are a pack of lies? I don't know of any empirical work on that subject, but I have never seen an instance of it. If Dempsey just sticks with his notes during a deposition, Eagan's case is doomed, because he must show a "complete abandonment of medical judgment" to have a viable constitutional claim. *Norfleet v. Webster*, 439 F.3d 392, 396 (7th Cir. 2006). (Eagan has not made a malpractice claim under state law.)

If legal assistance were available in unlimited quantities, I could go along with a remand. But, like every other valuable thing, legal time is scarce. When a judge persuades a lawyer to spend time on a weak case such as Eagan's, that time comes from somewhere. The "somewhere" might be golfing or watching Netflix, but more likely the time must be diverted from other clients. "Why should a judge ask lawyers to devote less of their time to people with strong cases and more to people with weak ones? That would injure other litigants." *Pickett v. CTA*, 930 F.3d 869, 871 (7th Cir. 2019). This is among the reasons why "courts must be careful stewards of th[e] limited resource [of volunteer lawyers]." *Cartwright v. Silver Cross Hospital*, 962 F.3d 933, 934 (7th Cir. 2020). People who receive less legal attention as a result of a judge's decision to recruit counsel are invisible to the court, but they are no less deserving of consideration. When we compel a judge to divert the resources of the bar to weak claims such as Eagan's, we reduce the likelihood that other persons will receive adequate legal assistance.

There is another potential effect when a judge recruits a lawyer to assist a plaintiff with a weak case: the wages of crying wolf. A lawyer might believe a judge the first time such a request is made but will learn from the experience

and say "no" the next time, even though the next plaintiff may be more deserving. In the Northern District of Illinois, home to big firms with platoons of young lawyers craving trial experience, the bar might answer the judicial call just to give associates a learning opportunity. But in other districts, where the practices are smaller, firms lack the resources to deploy aid in that fashion. Eagan's suit was filed in Peoria, Illinois, which has a population around 115,000. Springfield, about the same size, is the other "big" city in the Central District of Illinois. The adjacent Southern District of Illinois comprises even smaller cities, such as Belleville (44,000), Alton (28,000), East St. Louis (27,000), Carbondale (26,000), Centralia (13,000), Benton (7,000), and Cairo (3,000)—though the Southern District has a majority of the state's prison inmates, so the demand for aid is greatest there.

Recently a district court in East St. Louis tried valiantly to recruit counsel for a prisoner but failed. More than 100 lawyers turned the court down. See *Roberts v. Neal*, 713 Fed. App'x 509 (7th Cir. 2018). Perhaps the available supply of lawyers had been prevailed on too often to assist plaintiffs with little chance of success, and they had learned that it is safest to say no. An appellate command to recruit a lawyer for Eagan may send more of the same message, with the unfortunate result that prisoners who could win if only they had legal assistance will be left out in the cold.