In the

# United States Court of Appeals

## For the Seventh Circuit

No. 23-1253

SHAWN RILEY,

*Plaintiff-Appellant*,

*v.*

JOLINDA WATERMAN and SANDRA MCARDLE,

*Defendants-Appellees*.

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:20-cv-01252 — **Pamela Pepper**, *Chief Judge*.

ARGUED SEPTEMBER 18, 2024 — DECIDED JANUARY 27, 2025

Before RIPPLE, JACKSON-AKIWUMI, and KOLAR, *Circuit Judges*.

RIPPLE, *Circuit Judge*. Shawn Riley, formerly a prisoner at the Wisconsin Secure Program Facility ("WSPF"), filed this action under 42 U.S.C. § 1983 against WSPF's Health Services Manager, Jolinda Waterman, and WSPF Nurse Practitioner Sandra McArdle ("NP McArdle"), in the United States

District Court for the Eastern District of Wisconsin,[1] alleging they were deliberately indifferent to his serious medical needs in violation of the Eighth Amendment.[2] The district court granted the defendants' motions for summary judgment and denied Mr. Riley's two motions to appoint counsel. In this appeal, Mr. Riley contends that the district court erred in granting the summary judgment motions. He also submits that the district court abused its discretion by denying his second motion to appoint counsel. For the reasons set forth in this opinion, we affirm the judgment of the district court.[3]

## I

## BACKGROUND

### A.

Ms. Waterman served as the WSPF Health Services Manager from January 2015 until her retirement in May 2019. In that capacity, she "managed the health care services provided by the [Health Services Unit ('HSU')] and provided overall administrative support and direction."[4] She did not evaluate or treat inmates, nor did she make referrals to or approve treatment recommendations from offsite specialists. Ms. Waterman also had no role in referring inmates' special needs requests to the Special Needs Committee ("SNC").[5] Those tasks

---

[1] The jurisdiction of the district court is predicated on 28 U.S.C. §§ 1331 and 1343.

[2] The Eighth Amendment is applicable to the states through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666 (1962).

[3] Our jurisdiction is secure under 28 U.S.C. § 1291.

[4] R.36 at 6 ¶ 26.

[5] Mr. Riley did not dispute this fact.

were reserved for Advanced Care Providers such as NP McArdle. After an inmate visited an offsite provider, an Advanced Care Provider would record the offsite provider's recommendations in the inmate's medical file and, if the Advanced Care Provider agreed with the recommendation, order the suggested treatment. Additionally, Advanced Care Providers were to refer inmates' special needs requests to the SNC instead of ordering items.

Mr. Riley first received medical treatment pertinent to this case on July 27, 2016, when he visited the HSU for foot and leg pain. A nonparty provider ordered ibuprofen, physical therapy, knee braces, and stretching. The next month, he submitted a Health Services Request[6] ("HSR") because he was experiencing "serious" hip and back pain after playing basketball.[7] A nonparty provider replied, informing him that he was scheduled to be seen in the HSU. In September 2016, Ms. Waterman responded to another HSR from Mr. Riley in which he had asked to consult with an orthopedist.[8] She indicated that Mr. Riley previously had consulted with an orthopedist, and that there were no additional consults ordered.

NP McArdle first saw Mr. Riley for his pain on January 4, 2017. She ordered foot x-rays and ankle braces.[9] She also referred him to a podiatrist and a physical therapist. Later in January 2017, another provider at the prison ordered

---

[6] Inmates submit HSRs to receive nonemergency medical treatment.

[7] R.42-1 at 25.

[8] In her role as Health Services Manager, Ms. Waterman only saw and responded to HSRs when HSU staff specifically forwarded them to her.

[9] Mr. Riley may not have received the ankle braces until April 2017, despite NP McArdle's contention that she provided them on January 4, 2017.

Mr. Riley a TheraBand for his physical therapy. And on February 20, 2017, NP McArdle ordered soft shoe inserts for Mr. Riley.

Mr. Riley went to his first appointment with a podiatrist, Dr. Michael Jacobs, on March 24, 2017. Dr. Jacobs diagnosed him with plantar fasciitis in both feet, "[a]nkle equinus secondary to tight heel cord," and "[p]es planovalgus."[10] He recommended soft inserts and "high top athletic type shoes," but held off on prescription orthotics.[11] Reviewing Dr. Jacobs's recommendations, NP McArdle noted that Mr. Riley had soft inserts and could purchase his own high-top shoes "per policy."[12] WSPF's personal property policy limits inmates' possessions. All inmates receive one pair of state-issued shoes, and three circumstances permit an inmate to wear other shoes. First, an inmate may wear orthopedic shoes provided by the HSU. Second, an inmate may buy shoes from an approved vendor catalog, spending no more than $75 per pair. Third, an inmate may buy medically necessary shoes from a non-approved vendor with permission from the SNC.

Mr. Riley filed an HSR on March 24, stating that the inserts alone would not suffice and requesting ankle and back braces. He was placed on the HSU provider list for an evaluation. On March 29, 2017, NP McArdle ordered x-rays of his spine, hip, and right knee. On March 31, 2017, another inmate overheard Ms. Waterman tell a corrections officer that a specialist had

---

[10] R.42-1 at 43.

[11] *Id.*

[12] *Id.* at 34.

recommended Mr. Riley receive a personal medical item, but "Riley had another th[ing] coming."[13]

Mr. Riley received ankle braces to wear "when up and about" on April 11, 2017.[14] That same day, Mr. Riley submitted an HSR addressed to Ms. Waterman, asking for guidance on getting high-top shoes per Dr. Jacobs's orders. He stated that he could not find "adequate" shoes for $75.[15] A nonparty provider responded, "You will need to adhere to policy."[16] On April 25, 2017, NP McArdle scheduled an appointment for Mr. Riley to be fitted for custom orthotics. She also instructed him not to play basketball or run, but instead to use the exercise bike. Two days later, NP McArdle ordered an electromyography ("EMG") for Mr. Riley that came back negative.[17]

Mr. Riley saw Dr. Jacobs again on May 5, 2017. Dr. Jacobs recommended prescription orthotics for Mr. Riley and told him that he would need to break them in but to follow up if he still had difficulty after one month. Dr. Jacobs also suggested continued stretching, physical therapy, and, "if possible," an "athletic type shoe, high-top in nature."[18] NP McArdle issued a physical therapy referral, but only noted the shoe recommendation in Mr. Riley's file. Mr. Riley saw a physical therapist on May 23, 2017, who prescribed a transcutaneous electrical nerve stimulation ("TENS") unit to

---

[13] R.46-1 at 99.

[14] R.38-2 at 40.

[15] R.42-1 at 20.

[16] *Id.*

[17] A negative EMG indicates that Mr. Riley did not have neuropathy.

[18] *Id.* at 42.

alleviate his pain.[19] The provider did not recommend further sessions "[due to] lack of success [with] PT in past."[20]

Mr. Riley received his custom orthotics on May 24, 2017. The following day, he informed the HSU that they did not "mitigate, address[,] nor correct" his pain, and the padding tore off.[21] In June 2017, Mr. Riley reiterated that the orthotics were "useless."[22] NP McArdle recommended that he give them at least a month but also indicated that she had requested a follow-up podiatry appointment. Mr. Riley submitted more HSRs during the summer of 2017. On June 19, 2017, he indicated that he purchased high-top shoes from the catalog that were "actually mid,"[23] and asked to be seen by the podiatrist within the week. NP McArdle replied that she had scheduled an appointment. In July and August, he reported persistent pain and alleged, among other things, that the HSU delayed his seeing a specialist[24] and declined to evaluate him for night splints. Ms. Waterman responded that a podiatry follow-up was scheduled and night splints had been ordered. She also noted that he had not requested more extra strength Tylenol and informed him that the HSU has "NOTHING to do with personal shoes."[25]

---

[19] A few months passed before he received it.

[20] *Id.* at 41.

[21] *Id.* at 21.

[22] *Id.* at 22.

[23] *Id.* at 24.

[24] The usual wait time for a podiatry appointment was six to twelve weeks, though it could be longer.

[25] *Id.* at 11–12.

Because Mr. Riley had to wait to see Dr. Jacobs, HSU staff offered Mr. Riley an appointment with "Dr. Miller."[26] Mr. Riley's medical file indicates that Dr. Miller recommended "air bubbled athletic tennis shoes" at their August 15, 2017 appointment.[27] That recommendation was not approved. Mr. Riley sent another HSR, asking that his medical file be updated to reflect Dr. Miller's additional recommendations for air bubbled athletic sandals, personal socks, and an herbal pain remedy. Ms. Waterman spoke with Dr. Miller and replied to Mr. Riley: "You purely circumvented the shoe policy. HSU does not purchase athletic shoes. You can purchase your shower sandals and socks through canteen. There is no approval for herbal supplement turmeric in the" Department of Corrections ("DOC").[28]

Mr. Riley submitted another extensive HSR on August 25, 2017. In response, Ms. Waterman informed him that his podiatry appointment was scheduled. She also noted that "plantar fasciitis is a chronic condition. It is not easily treated," and directed him to purchase shoes from the catalog.[29] In late September 2017, NP McArdle ordered Mr. Riley a physical therapy ball. Mr. Riley submitted more HSRs in October 2017, alleging that he was still suffering from untreated chronic pain. Ms. Waterman and NP McArdle responded, refuting his allegations that he was not being treated. Ms. Waterman noted that he had not refilled his Naproxen prescription, and NP McArdle reminded him of the EMG, physical therapy,

---

[26] R.46-1 at 57.

[27] R.38-2 at 29; *see* R.42-1 at 17.

[28] R.42-1 at 17.

[29] R.38-2 at 8.

and medications he had received. On October 13, 2017, another inmate witnessed Ms. Waterman telling a nurse, "Whatever you do, don't make any orders or notes about shoes, I'm in hot water about it."[30]

Mr. Riley saw Dr. Jacobs for the third time on November 17, 2017. Dr. Jacobs indicated that "a shock absorption shoe with air-type shock absorption … would be optimum," but noted that this type of shoe may not be permissible.[31] On December 1, 2017, Mr. Riley received a memorandum from "HSU Staff" that read, "HSU reviewed your request for a special shoe restriction. … Your specific request has been DENIED. You must follow the property guidelines."[32] On December 14, 2017, Mr. Riley wrote an HSR asking why the HSU was following all specialist recommendations except those for medical shoes. NP McArdle referred him to the catalog because "HSU does not provide personal athletic shoes."[33]

In January 2018, NP McArdle ordered a podiatry follow-up to assess whether Mr. Riley needed APEX shoes, which are orthopedic shoes provided by the HSU. She also referred him to an orthopedist for his knee pain. Mr. Riley saw an orthopedic surgeon, Dr. Edward Riley, on March 23, 2018. Commenting on Dr. Riley's recommendation that Mr. Riley be allowed to purchase non-catalog shoes, NP McArdle wrote, "Not

---

[30] R.51-1 at 61.

[31] R.42-1 at 38.

[32] R.38-2 at 1. This form differed from the DOC-3758 "Notice of Special Needs Committee Decision" forms he had received in response to his requests to eat in his cell and receive an extra pillow. R.38-2 at 37; R.51-1 at 10.

[33] R.42-1 at 5.

allowed per DOC policy."[34] But she did recommend him for APEX shoes.

Mr. Riley saw Dr. Jacobs for the fourth time on April 20, 2018. Dr. Jacobs recommended "air-filled athletic shoe gear," commenting that Mr. Riley could be allowed to purchase from a non-catalog supplier and exceed the $75 price limit.[35] But he noted that "these are simply recommendations."[36] In Mr. Riley's Progress Notes, Ms. Waterman wrote, "Personal shoes are not provided through HSU medical restrictions."[37] On May 9, 2018, NP McArdle explained again that Mr. Riley could purchase personal athletic shoes that would address his plantar fasciitis from the catalog. Later that month, she referred him to the University of Wisconsin's podiatry clinic for a second opinion on his foot and ankle pain. On May 15, 2018, Mr. Riley received another memorandum from HSU Staff informing him that his shoe request had been denied.

Mr. Riley submitted an HSR on June 13, 2018, alleging that the HSU was "refusing the ordered care."[38] He stated that the Naproxen, cream, braces, wraps, and TENS treatments were "all of no use."[39] NP McArdle responded that specialists' recommendations "are just that."[40] She also suggested that he ice

---

[34] R.38-2 at 26.

[35] R.42-1 at 37.

[36] *Id.*

[37] R.38-2 at 25.

[38] R.42-1 at 6.

[39] *Id.*

[40] *Id.*

and strengthen his feet and ankles. He sent another HSR the next day, asking whether WSPF would "honor UW's services."[41] NP McArdle informed him that specialist recommendations are fulfilled "if allowed by DOC policy … and security concerns."[42]

On July 11, 2018, Mr. Riley saw a podiatrist, Dr. Audra Smith, at the University of Wisconsin's clinic. Assessing his condition, she explained, "this is about proper support and until he gets the right shoes and inserts, this pain will not go away and it will continue to get worse."[43] Dr. Smith recommended that Mr. Riley be allowed to purchase shoes from outside the catalog that exceeded the $75 limit, but did note that some shoes in the catalog may be suitable. She wrote, "There are a lot of shoes out there … that work for orthotics and the condition that he has, so I believe from the catalog some of the New Balance options work for guys."[44] She also suggested Naproxen twice a day and physical therapy. A week later, NP McArdle advised Mr. Riley that the DOC's rule against purchasing outside shoes was a security rule, not an HSU rule, and "[t]he warden is the only person who can waive a security rule."[45]

A year later, Mr. Riley was transferred to a new facility.

---

[41] *Id.* at 8.

[42] *Id.*

[43] R.38-2 at 45.

[44] *Id.*

[45] R.42-1 at 26.

**B.**

After Mr. Riley filed his pro se complaint, he filed a motion to appoint counsel, noting that expert witnesses probably would be required at trial for his medical claim. He also emphasized the case's factual complexity, his limited legal knowledge, and his transfer to a new institution. He informed the court that he had tried to obtain counsel, attaching the letter AA Sabel Law Office had sent declining assistance and the letter he had sent to attorney Michael Witt that was returned to Mr. Riley as not deliverable. The district court denied his motion without prejudice on October 30, 2020, concluding that his concerns about expert testimony were premature, and that the case's complexity and his limited knowledge of the law were not unique. The court also screened his complaint and ordered him to file an amended complaint, which he did on December 9, 2020.

As his case progressed, Mr. Riley again tried to obtain counsel. In an August 2021 letter, attorney Lonnie D. Story indicated that he was sending a retainer agreement for Mr. Riley to execute. Mr. Story sent another letter on September 21, 2021. In that letter, he declined to represent Mr. Riley in another matter but confirmed that he would continue to represent Mr. Riley in his civil suit. Mr. Story corrected himself a month later and informed Mr. Riley that the September letter had been sent in error. He indicated that his firm would not represent Mr. Riley and that he would return Mr. Riley's documents shortly. Mr. Riley received this letter "on or around October 25, 2021," after the discovery deadline.[46]

---

[46] R.33 at 2.

On November 16, 2021, Mr. Riley filed his second motion to appoint counsel. He again stated that the legal and factual issues were too complex for him to litigate. He also recounted his confusion with Mr. Story, attaching Mr. Story's three letters. Ms. Waterman and NP McArdle filed motions for summary judgment the following week.

On August 16, 2022, the district court granted the defendants' motions for summary judgment and denied Mr. Riley's second motion to appoint counsel. Addressing Mr. Riley's Eighth Amendment claim, the court acknowledged that his chronic pain was an objectively serious medical condition of which Ms. Waterman and NP McArdle were aware. However, held the court, neither of these defendants was deliberately indifferent to his serious medical needs. The court noted the repeated treatment of his plantar fasciitis. It also rejected his contention that they had ignored the specialists' recommendations, because none of the podiatrists prescribed a specific shoe for Mr. Riley. Moreover, the court found that the SNC had reviewed and denied Mr. Riley's special shoe requests twice. And the court did not interpret Ms. Waterman's comments regarding Mr. Riley's shoes as malicious—at most, they indicated frustration.

The court then addressed Mr. Riley's motion to appoint counsel, first noting that Mr. Riley had made a reasonable attempt to secure counsel. However, in the court's view, he was sufficiently competent to litigate the case himself. He could communicate effectively with the court and follow instructions, and his amended complaint was "clear and straightforward." *Riley v. Waterman*, No. 20-cv-1252, 2022 WL 3369548, at *19 (E.D. Wis. Aug. 16, 2022). Furthermore, his misunderstanding with Mr. Story was "not a basis for the court to

recruit counsel." *Id.* It may have warranted deadline extensions, but Mr. Riley had not requested them.

## II

## DISCUSSION

### A.

We review the district court's order granting summary judgment de novo, viewing the facts in the light most favorable to Mr. Riley and drawing all reasonable inferences in his favor. *See Clemons v. Wexford Health Sources, Inc.*, 106 F.4th 628, 634 (7th Cir. 2024). Summary judgment is appropriate if "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Prison officials' deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). To prevail on a deliberate indifference claim, the plaintiff must prove (1) that he had an objectively serious medical condition (2) to which prison officials were "deliberately, that is subjectively, indifferent." *Johnson v. Dominguez*, 5 F.4th 818, 824 (7th Cir. 2021) (quoting *Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662 (7th Cir. 2016)). The defendants do not dispute that plantar fasciitis-related pain is an objectively serious medical condition. We therefore focus on the second element of the claim.

Prison officials are deliberately indifferent when they know of and disregard a substantial risk to the inmate's health. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Medical negligence is not enough; the chosen treatment plan must "represent[] so significant a departure from accepted professional standards or practices that it calls into question

whether the [provider] actually was exercising … profes-
sional judgment." *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir.
2014). In assessing a claim that a prisoner was subjected to
such treatment, "we look at the totality of an inmate's medical
care when considering whether that care evidences deliberate
indifference to serious medical needs." *Petties v. Carter*, 836
F.3d 722, 728 (7th Cir. 2016) (en banc).

An inmate may establish deliberate indifference by
demonstrating that prison officials ignored a specialist's in-
structions. *See Zaya v. Sood*, 836 F.3d 800, 805–06 (7th Cir.
2016). But "[d]isagreement … between two medical profes-
sionals[] about the proper course of treatment generally is in-
sufficient, by itself, to establish an Eighth Amendment viola-
tion." *Pyles*, 771 F.3d at 409 (citing *Johnson v. Doughty*, 433 F.3d
1001, 1013 (7th Cir. 2006)). In *Zaya*, we reversed a grant of
summary judgment where the prison physician waited seven
weeks to send an inmate for a follow-up appointment, which
was four weeks longer than the specialist had recommended.
Because the specialist had "actually described the risks of fur-
ther delay," there was a genuine dispute about whether the
prison doctor "simply ignored"—as opposed to disagreed
with—the specialist's instructions. 836 F.3d at 806–07.

Persisting with an ineffective course of treatment also can
constitute deliberate indifference. In *Greeno*, we reversed a
grant of summary judgment where the defendants refused to
change the inmate's medication despite his repeated reports
that it was not working. *See Greeno v. Daley*, 414 F.3d 645, 654–
55 (7th Cir. 2005). However, in *Reck*, we affirmed a grant of
summary judgment where the defendant physician referred
the inmate to a specialist and prescribed medications to

manage his condition in the meantime. *See Reck v. Wexford Health Sources, Inc.*, 27 F.4th 473, 480, 485 (7th Cir. 2022).

With those standards in mind, we now turn to Mr. Riley's claims against Ms. Waterman and NP McArdle. Mr. Riley submits that the district court erred in granting summary judgment for the defendants because they ignored specialists' recommendations to allow him to buy high-top shoes, persisted with an ineffective course of treatment, and denied him access to the SNC.

Considering the totality of medical care Mr. Riley received, there was no Eighth Amendment violation. First, the record supports the district court's conclusion that Ms. Waterman and NP McArdle did not ignore the specialists' recommendations that Mr. Riley be permitted to acquire high-top shoes. Instead, they sought to comply with both DOC policy and the treatment recommendations by instructing Mr. Riley to order suitable shoes from the catalog.[47] But, even if their refusal to permit Mr. Riley to order shoes from outside the approved catalog constitutes a disagreement with specialists' recommendations, disagreements between medical professionals about the proper course of treatment rarely amount to deliberate indifference. *See Pyles*, 771 F.3d at 409; *Zaya*, 836 F.3d at 805. There is certainly nothing in this record to justify departure from that general rule.

Nor does the record support the view that the defendants doggedly persisted in an ineffective course of treatment.

---

[47] Indeed, one specialist, Dr. Smith, acknowledged that there were suitable shoes in the catalog: "There are a lot of shoes out there … that work for orthotics and the condition that he has, so I believe from the catalog some of the New Balance options work for guys." R.38-2 at 45.

When NP McArdle first saw Mr. Riley for foot pain, she ordered ankle braces and foot x-rays. She later ordered soft shoe inserts, then custom orthotics when the inserts did not alleviate his pain. When Mr. Riley's discomfort persisted, she did more diagnostic testing in the form of x-rays and an EMG. To help him manage the pain, she also ensured that Mr. Riley received pain medications, ice, and a TENS unit. In addition to these treatments, she referred Mr. Riley to offsite specialists on six occasions. *See Reck*, 27 F.4th at 485. Overall, NP McArdle provided extensive medical care in accordance with the specialists' recommendations.[48] The record contains no evidence from which a jury could infer that the defendants knew these treatments would be ineffectual but persisted anyway.

Moreover, a reasonable jury could not conclude that the defendants were deliberately indifferent in declining to elevate Mr. Riley's shoe requests to the SNC. Because Ms. Waterman was not an Advanced Care Provider, she was not responsible for referring special needs requests to the SNC.[49] NP McArdle was an Advanced Care Provider and could have referred his requests. As we stated in *Petties*, deviation from an established protocol can be circumstantial evidence of deliberate indifference. 836 F.3d at 729. But as we also emphasized in that case, an overarching consideration in assessing a deliberate indifference claim is an examination of the totality

---

[48] As Health Services Manager, Ms. Waterman was not personally involved in Mr. Riley's medical care beyond responding to some of his HSRs.

[49] Therefore, even if her comments that Mr. Riley had "another th[ing] coming" and she was "in hot water about" shoes demonstrate frustration, she was not deliberately indifferent. R.46-1 at 99; R.51-1 at 61.

of circumstances of the patient's care. *Id.* at 728. Moreover, even if, with the benefit of hindsight, NP McArdle should have sent forward Mr. Riley's requests, there is no indication that her failure to do so constituted deliberate indifference. She knew he was receiving treatment for his condition and that he had declined to buy suitable shoes available to him. She also knew that the specialists understood that prison security concerns might well preclude Mr. Riley's procuring the optimum model of shoe. In the context of the totality of care provided to Mr. Riley, a rationale jury could not conclude that NP McArdle's decision that Mr. Riley should give the shoe choices available to him a more sustained try amounted to deliberate indifference.

For these reasons, the district court properly concluded that Ms. Waterman and NP McArdle were not deliberately indifferent to Mr. Riley's condition.

**B.**

Mr. Riley also submits that the district court abused its discretion in denying his second motion to appoint counsel. He is correct in stating that we review a district court's denial of a request for appointed counsel for abuse of discretion. *Pruitt v. Mote*, 503 F.3d 647, 658 (7th Cir. 2007) (en banc). *Pruitt* makes clear that a court abuses its discretion when "(1) the record contains no evidence upon which the court could have rationally based its decision; (2) the decision is based on an erroneous conclusion of law; (3) the decision is based on clearly erroneous factual findings; or (4) the decision clearly appears arbitrary." *Id.* (quoting *Musser v. Gentiva Health Servs.*, 356 F.3d 751, 755 (7th Cir. 2004)).

**1.**

We begin by stating the governing principles that are well-established by statute and case law. First, a federal civil litigant has no right to court-recruited counsel. *See Dewitt v. Corizon, Inc.*, 760 F.3d 654, 657 (7th Cir. 2014). But under the federal *in forma pauperis* statute, the court may request an attorney for "any person unable to afford counsel." 28 U.S.C. § 1915(e)(1). In so doing, the district court must make the following inquiries: "(1) [H]as the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so; and if so, (2) given the difficulty of the case, does the plaintiff appear competent to litigate it himself?" *Pruitt*, 503 F.3d at 654–55.[50] If the district court abused its discretion in conducting that inquiry, "we will reverse only upon a showing of prejudice." *Id.* at 659.

In determining whether a plaintiff appears competent to litigate the case without the assistance of counsel, the court must consider "both the factual and legal complexity of the plaintiff's claims and the competence of the plaintiff to litigate those claims himself," which are "necessarily intertwined." *Eagan v. Dempsey*, 987 F.3d 667, 682 (7th Cir. 2021) (quoting *Pruitt*, 503 F.3d at 655). There are no "fixed criteria" for assessing whether a plaintiff is sufficiently competent to litigate his case, but "a district court certainly should consider the plaintiff's literacy, communication skills, educational level, litigation experience, intellectual capacity, and psychological

---

[50] To the degree that the district court considered the merits of Mr. Riley's case in its consideration of the motion to appoint counsel, see R.64 at 48 ("Whether a lawyer had presented the evidence or the plaintiff presented it himself, the evidence does not support the plaintiff's claims."), it did not abuse its discretion. *See Watts v. Kidman*, 42 F.4th 755, 763 (7th Cir. 2022).

history." *Id.* Nor are there fixed criteria for evaluating the complexity of the plaintiff's claims, but "[s]ome of the circumstances that require judicial consideration are the phase of the litigation, if the prisoner has been transferred between facilities, if the claims involved the state of mind of the defendant such as those involving deliberate indifference, and if the case involves complex medical evidence, including expert testimony." *Thomas v. Wardell*, 951 F.3d 854, 860 (7th Cir. 2020); *see Eagan*, 987 F.3d at 682–83.

**2.**

Keeping in mind the deference we owe the district court, we now evaluate the denial of Mr. Riley's request for appointed counsel. Mr. Riley made reasonable attempts to obtain counsel prior to filing his motion. He contacted at least four attorneys, all of whom either declined to take his case or did not reply. Even though Mr. Riley's correspondence with one of those attorneys prompted confusion, the district court was on solid ground in concluding that Mr. Riley's misunderstanding with Mr. Story was not, standing alone, a ground for recruiting counsel. Instead, Mr. Riley could have moved to reopen discovery or to extend the deadline for his response to the defendants' summary judgment motions. Thus, we must determine whether the district court abused its discretion in determining that Mr. Riley appeared competent to litigate his case without the assistance of counsel.

We first consider the nature of the case. Relatively straightforward claims of deliberate indifference do not require appointed counsel. *See Perez v. Fenoglio*, 792 F.3d 768,

784 (7th Cir. 2015).[51] Because he "received at least *some* medical treatment," Mr. Riley had to show "a substantial departure from acceptable professional judgment, practice, or standards."[52] Questions of proper medical treatment often involve complex medical evidence and require expert testimony. But Mr. Riley's claim primarily rests on the defendants' intent, not on complex medical evidence. The primary question is not whether the specialists were correct to recommend high-top shoes; instead, it is whether Ms. Waterman and NP McArdle consulted the specialists at all. The record reveals that they reviewed the specialists' proposed treatments, most of which were cabined as recommendations.[53] Although state-of-mind questions can be difficult for pro se litigants, see *Eagan*, 987 F.3d at 683, here the district court was entitled to conclude, on the record before it, that this case

---

[51] *See also Johnson v. Doughty*, 433 F.3d 1001 (7th Cir. 2006). In *Johnson*, the plaintiff alleged that prison officials were deliberately indifferent because they treated his hernia through non-surgical means. *See id.* at 1003. The district court did not abuse its discretion by declining to appoint counsel because the case "was not overly difficult." *Id.* at 1007. We note that *Johnson* predated *Pruitt* but is cited favorably in *Pruitt*. *See Pruitt*, 503 F.3d at 654–56.

[52] Appellant's Br. 37 (quoting *Eagan v. Dempsey*, 987 F.3d 667, 683 (7th Cir. 2021) (emphasis in original)).

[53] When he recommended a "shock absorption shoe" for Mr. Riley, Dr. Jacobs recognized that this type of shoe may not be permissible. R.42-1 at 38. At a later appointment, Dr. Jacobs reiterated that his shoe suggestions "are simply recommendations." *Id.* at 37. And Dr. Smith "recommended" that Mr. Riley be allowed to purchase non-catalog shoes but noted that some shoes from the catalog could work for his orthotics. R.38-2 at 45.

presented no particular difficulties that would have been ameliorated by the participation of counsel at summary judgment.[54]

We next consider the district court's estimation of the complexity of the case considering Mr. Riley's litigation capabilities. *See Pruitt*, 503 F.3d at 655. The court addressed this point and clearly believed that Mr. Riley was sufficiently competent to litigate the case himself. Indeed, the court gave specific reasons for its conclusion. In its view, Mr. Riley "had no difficulty communicating with the court in writing" and filed a "clear and straightforward" amended complaint that adequately explained the facts. *Riley*, 2022 WL 3369548, at *19. He also responded to the defendants' arguments, cited source documents, and filed hundreds of pages of documents with the court. Mr. Riley "[was] a better communicator than many unrepresented plaintiffs," and did a "very thorough, capable job of representing himself." *Id.* Because Mr. Riley was sufficiently able to litigate his relatively straightforward deliberate indifference case, the district court did not abuse its discretion in declining to appoint counsel.

### Conclusion

The judgment of the district court is affirmed.

AFFIRMED

---

[54] Mr. Riley's contention that his transfer to a new facility warranted the appointment of counsel is equally unavailing. In *Santiago*, an inmate's transfer should have been considered because he did not know the names of some of the defendants and witnesses. *See Santiago v. Walls*, 599 F.3d 749, 763 (7th Cir. 2010). In contrast, Mr. Riley knew the identities of both defendants and was able to obtain declarations from two witnesses. He also conducted discovery from his new institution.

JACKSON-AKIWUMI, *Circuit Judge,* dissenting in part. I dissent in part because there are facts in the record from which a jury could find for Shawn Riley on his claim that defendants were deliberately indifferent to his serious medical needs. Below, I highlight those facts before explaining my differing analysis of the claim. I conclude with a brief note about Riley's motion for appointment of counsel, though I join my colleagues' resolution of this second issue.

## I

There are three sets of facts in this hefty evidentiary record which, when taken with the factual background recited in the majority opinion, compel my conclusion that Riley's case should have proceeded to a jury trial.

First is the timing and repetition of the specialists' recommendations about Riley's care. As shown below, physicians made numerous specific recommendations that Riley receive high-top athletic shoes:

| Date | Specialist | Recommendation |
|---|---|---|
| March 24, 2017 | Dr. Jacobs | "high top athletic type shoes" |
| May 5, 2017 | Dr. Jacobs | "athletic type shoe, high-top in nature" |
| November 17, 2017 | Dr. Jacobs | "shoe gear that will allow adequate depth to accommodate orthotic" |
| March 23, 2018 | Dr. Riley | "I restated on the prison form the diagnoses and recs Dr. Jacobs had put down 11/18/17" |

| April 20, 2018 | Dr. Jacobs | "air-filled athletic shoe gear … above 75 dollars patient would be responsible." |
| July 11, 2018 | Dr. Smith | "allow him to purchase his own personal shoes from an outside catalog and exceed the $75 limit as needed. He needs stability athletic-style shoes that can accommodate his orthotics."[1] |

Second is the prison's policy that required nurses, including McArdle, to refer requests for non-vendor footwear to the Special Needs Committee (SNC). Specifically, prison policy mandated that "[p]rescribing practitioners *shall* refer items … for review of special needs [by the SNC] rather than write orders for specific items."[2] Regarding shoes, the policy stated that the Health Service Unit (HSU) had no power to permit inmates to order shoes from outside the prison's vendor catalog, and the only way to access such shoes was approval from the SNC. The SNC was comprised of medical and security staff. When reviewing requests for special items, the SNC considered the inmate's medical record, the requested item's medical benefit, and the potential effect on the prison's security environment.

---

[1] R. 42-1 at 43; R. 42-1 at 42; R. 42-1 at 38; R. 38-2 at 51; R. 42-1 at 37; R. 38-2 at 45.

[2] R. 38-5 at 2 (emphasis added).

Third is Waterman's stated disregard for the specialists' recommendations concerning Riley. Waterman told an HSU nurse not to "make any orders or notes about shoes" because she was "in hot water about it."[3] Waterman also remarked that Riley "had another th[ing] coming" if he thought he would get access to the specialist-recommended footwear.[4]

## II

With these facts in mind, I turn to the four ways I depart from my colleagues' analysis of the deliberate indifference issue.

The majority opinion concludes that Riley's claims fail because Waterman and McArdle "did not ignore the specialists' recommendations that Mr. Riley be permitted to acquire high-top shoes[, but] [i]nstead … sought to comply with both DOC policy and the treatment recommendation by instructing Mr. Riley to order suitable shoes from the catalog." *Ante*, at 15. But there is evidence from which a jury could conclude that the defendants intentionally denied Riley shoes and failed to comply with policy.

Prison policy required nurses to refer non-vendor shoe requests to the SNC. Nurses were not allowed to take any other action because the SNC had sole authority to determine whether shoes were medically necessary and permissible. A jury considering that the specialists' recommendations for Riley were not referred to the SNC despite the mandatory policy language, along with Waterman's instructions to the nurses not to make "any order or notes about shoes," could conclude

[3] R. 51-1 at 61.

[4] *Id.* at 87.

that the defendants not only ignored policy but purposely obstructed the established review system for non-vendor shoe requests.

The majority opinion's contrary conclusion rests on the premise that acceptable shoes were available to Riley through the vendor catalog. But that factual premise is disputed. Riley's health service requests, which were submitted to the HSU, stated that the "high top" shoe he ordered from the catalog was "actually mid[-top]," and did not provide adequate foot support or accommodate his orthotics.[5] Plus, the final two specialist recommendations expressly stated that Riley needed shoes from outside the catalog. Given this factual dispute, I find it impossible to conclude, as my colleagues do, that the defendants "did not ignore the specialists' recommendations" and the defendants "sought to comply" with DOC policy. *Ante*, at 15.

Next, the majority reasons that even if McArdle and Waterman disagreed with the specialists' recommendations, "disagreements between medical professionals about the proper course of treatment rarely amount to deliberate indifference." *Ante*, at 15. But that deferential consideration only applies where the medical practitioner is exercising medical judgment. *See McGee v. Adams*, 721 F.3d 474, 481 (7th Cir. 2013) (explaining that "[w]hen a medical professional *acts in his professional capacity*," the professional's treatment is judged against a highly deferential substantial departure standard) (emphasis added)); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) ("A medical professional is entitled to deference *in treatment decisions* …") (emphasis added)).

---

[5] R. 42-1 at 24.

Here, it is disputed whether McArdle exercised any medical judgment in denying Riley access to the SNC. After Dr. Jacobs recommended high-top shoes with adequate depth, McArdle advised Riley "that DOC will not allow him to wear personal shoes which are different from those available to all inmates."[6] Then, six days after Dr. Smith recommended that Riley be allowed high-top shoes from an outside vendor, McArdle noted in Riley's chart that he was not allowed to purchase outside shoes due to "a security rule, not an HSU rule."[7] McArdle's exclusive reliance on a security rule is not an application of medical judgment and is therefore not entitled to deference. A jury question remains.

Elsewhere, the majority determines that the record cannot support an inference that the defendants persisted in ineffective treatment. The prison provided Riley with a plethora of treatments, I agree. But the defendants blocked Riley's access to the single treatment that his specialists recommended again and again: high-top shoes. Our caselaw tells us that a prison official who "persists in a course of treatment known to be ineffective" can be found to have been deliberately indifferent. *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016) (en banc). And as the majority notes, Dr. Smith told the defendants that "until [Riley] gets the right shoes and inserts, this pain will not go away and it will continue to get worse." *Ante*, at 10. Riley told the defendants at least a dozen times that he was in "chronic, debilitating pain" and the care he had been provided was not helping.[8] Still, the defendants persisted in a

---

[6] *Id.* at 28.

[7] *Id.* at 26.

[8] *Id.* at 5, 6, 9–16, 18, 19, 21–25.

course of treatment that did not include the one intervention that his specialists all agreed would help: athletic shoes high enough to support his ankles and deep enough to accommodate his orthotics. This is sufficient record evidence to create a material issue of fact for a jury.

Finally, the majority states that a jury could not conclude that "the defendants were deliberately indifferent in declining to elevate Mr. Riley's shoe requests to the SNC." *Ante*, at 16. Deliberate indifference can be inferred where—as we have here—a prison official refuses to follow existing protocol. *Petties*, 836 F.3d at 728. Waterman told an HSU nurse not to "make any orders or notes about shoes," despite policy requiring that nurses refer all non-vendor shoe requests to the SNC. And over the course of sixteen months, McArdle, a nurse required to refer requests to the SNC rather than judge them on her own, declined to send the committee any of Riley's six specialists' recommendations. From this refusal to follow protocol—Waterman's instructions to ignore policy and McArdle's actual ignoring of policy—a jury could conclude that the defendants were deliberately indifferent.

In sum, the record evidence shows six specialist recommendations for high-top shoes, two obstructionist statements from Waterman, and zero referrals to the SNC. All while Riley reported, over and over again, "chronic, debilitating pain" with no relief from other treatment.[9] This is sufficient, in my view, for Riley to argue to a jury that the defendants were deliberately indifferent to his serious medical needs.

---

[9] *Id.* at 5, 6, 9–16, 18, 19, 21–25.

## III

On the other issue before us, I agree with my colleagues that the district court did not abuse its discretion in denying Riley's second motion for appointment of counsel. I pause here only to note that another district court judge could have easily granted Riley counsel given the following four considerations: (1) the advanced stage of litigation, *see Perez v. Fenoglio*, 792 F.3d 768, 785 (7th Cir. 2015) (discussing complexities of litigation past the initial pleading stage); (2) the fact that Riley had been transferred away from the facility where his claims arose, *see Pennewell v. Parish*, 923 F.3d 486, 491 (7th Cir. 2019) ("[A] prisoner who is transferred to a facility where the events underlying his claims did not take place faces additional hurdles."); (3) the fact that Riley's case involved proving the mental state of his medical providers, *see Eagan v. Dempsey*, 987 F.3d 667, 683 (7th Cir. 2021) ("We also have noted the increased complexity in constitutional claims involving the state of mind of the defendant, such as deliberate indifference."); and (4) Riley's loss of access to the legal library during the COVID-19 pandemic, *see id.* at 685 (finding plaintiff's transfer to "a facility with few resources and more restricted movement" was relevant to a determination of competency to litigate a case without assistance of counsel). But we review appointment of counsel decisions deferentially, and the district court here was within its discretion to deny Riley counsel.

For these reasons, I join in part and dissent in part.